# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

Wu Tien Li-Shou,                                  :

        Plaintiff,                            :

v .                                               :          Civil No. 1:13-cv-01366-JFM

UNITED STATES OF AMERICA,                         :

        Defendant.                            :

...oOo...

# UNITED STATES' MEMORANDUM
# IN SUPPORT OF ITS MOTION TO DISMISS

STUART F. DELERY
Acting Assistant Attorney General

ROD J. ROSENSTEIN
United States Attorney

JOSEPH BALDWIN
Assistant United States Attorney


By:    /s/ Jill Dahlmann Rosa
       JILL DAHLMANN ROSA
       THOMAS M. BROWN
       Trial Attorneys
       U.S. Department of Justice
       Civil Division, Torts Branch
       Aviation & Admiralty Litigation
       P.O. Box 14271
       Washington, DC 20044-1471

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 1

   A.  Piracy Background.............................................................................................. 1

   B.  Modern Piracy .................................................................................................... 2

   C.  International Counter-Piracy Operations ............................................................ 3

   D.  Counter-Piracy Policies of the Executive and Legislative Branches ................ 5

FACTS ........................................................................................................................ 8

ARGUMENT ............................................................................................................... 10

   I.    The *Baker v. Carr* Factors Apply Here. ............................................................ 11

   II.  The Challenged Acts Were Committed to the Political Branches. ..................... 12

   III. Military Strategy and Tactics Are Not Subject to Judicial Review. .................. 13

   IV. Plaintiff's Tort Allegations Do Not Make This Case Justiciable........................ 20

   V.  This Case Involves Nonjusticiable Foreign Relations. ...................................... 21

CONCLUSION ........................................................................................................... 22

# TABLE OF AUTHORITIES

## Federal Cases

*Aiello v. Kellogg, Brown & Root Servs., Inc.,*
  751 F. Supp. 2d 698 (S.D.N.Y. 2011) .................................................. 16, 17

*Aktepe v. United States,*
  105 F.3d 1400 (11th Cir. 1997) ................................................. 14, 15, 16, 23

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ................................................................. 12

*Baker v. Carr,*
  369 U.S. 186 (1962) ......................................................... 12, 13, 23

*Carmichael v. Kellogg, Brown & Root Servs.,*
  572 F.3d 1271 (11th Cir. 2009) ...................................................... 17

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010)............................................... 14, 15, 22

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) .................................................................. 14

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
  478 U.S. 221 (1986) ............................................................... 11

*Koohi v. United States,*
  976 F.2d 1328 (9th Cir. 1992) .................................................. 16, 17

*McMahon v. Presidential Airways, Inc.,*
  460 F. Supp. 2d 1315 (M.D. Fla. 2006) ............................................. 18

*Richmond, Fredericksburg & Potomac R. Co. v. United States,*
  945 F.2d 765 (4th Cir. 1991) ....................................................... 11

*Smith v. Reagan,*
  844 F.2d 195 (4th Cir. 1988) ....................................................... 23

*Smith v. Wash. Metro. Area Transit Auth.,*
  290 F.3d 201 (4th Cir. 2002) ....................................................... 11

*Taylor v. Kellogg Brown & Root Servs., Inc.,*
  658 F.3d 402 (4th Cir. 2011) ................................................... 18, 21

*Tiffany v. United States,*
  931 F.2d 271 (4th Cir. 1991) ................................................. 14, 15, 16

*United States v. Ali*,
   No. 12-3056, 2013 WL 2477029 (D.C. Cir. June 11, 2013) ........................................ 2

*United States v. Dire*,
   680 F.3d 446 (4th Cir. 2012) ........................................................................... passim

*United States v. Stanley*,
   483 U.S. 669 (1987) ...................................................................................... 12

**Constitution and Statutes**

U.S. Const. art. I, § 8 ..................................................................................... 5, 12

U.S. Const. art. II, § 2 .................................................................................. 12, 13

18 U.S.C. § 1651 ................................................................................................ 5

46 U.S.C. §§ 30901-30918 ................................................................................... 1

46 U.S.C. §§ 31101-31113 ................................................................................... 1

46 U.S.C. §§ 30302-30308 ................................................................................... 1

**Other Authorities**

Barbara B. Hillson, *Koohi v. United States: The Ninth Circuit Leads Federal
   Jurisdiction into Battle*, 28 Ga. L. Rev. 269 (1993) ................................................ 18

James Kraska, *Contemporary Maritime Piracy: International Law, Strategy, and
   Diplomacy at Sea* (2011) ..................................................................................... 3

Joseph Wheelan, *Jefferson's War: America's First War on Terror* (2003) ....................... 2

A.B.C. Whipple, *To the Shores of Tripoli: The Birth of the U.S. Navy
   and Marines* (1991) ............................................................................................ 1

Wright & Miller, Federal Practice & Procedure, § 3534.2 ......................................... 22

75 Fed. Reg. 19,869 (Apr. 15, 2010) ..................................................................... 7

76 Fed. Reg. 19,897 (April 7, 2011) ...................................................................... 8

77 Fed. Reg. 21,839 (April 10, 2012) ..................................................................... 8

78 Fed. Reg. 21,013 (April 4, 2013) ....................................................................... 8

**EXHIBITS**

Ex. A:  Report of the Secretary-General, United Nations Security Council, S/2011/662, Oct. 25, 2011

Ex. B:  United Nations Security Council, Resolution 1976, April 11, 2011

Ex. C:  White House, *Policy for the Repression of Piracy and Other Criminal Acts of Violence at Sea* (June 14, 2007)

Ex. D:  United States National Security Council, *Countering Piracy off the Horn of Africa: Partnership and Action Plan* (Dec. 2008)

Ex. E:  U.S. Navy Command Investigation into USS STEPHEN W. GROVES (FFG 29) Counter-Piracy Interdiction of F/V JIH CHUN TSAI 68 on 10 May 11 (May 31, 2011)

## UNITED STATES' MEMORANDUM
## IN SUPPORT OF ITS MOTION TO DISMISS

Defendant United States of America submits this Memorandum in support of its motion to dismiss the Complaint for nonjusticiability.  Fed. R. Civ. P. 12(b)(1).

Plaintiff Wu Tien Li-Shou, a resident of Taiwan, brings this action for the alleged wrongful death of her husband, Wu Lai-Yu, who was killed in the crossfire between Somali pirates, who had been holding him hostage for ransom, and a U.S. Navy vessel. Plaintiff brings this tort action under the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, the Public Vessels Act, 46 U.S.C. §§ 31101-31113, the Death on the High Seas Act, 46 U.S.C. §§ 30302-30308, and General Maritime Law, alleging that the United States Navy negligently caused her husband's death and intentionally destroyed his fishing vessel, which the pirates had captured and had been using as the "mother ship" for their skiff-based attacks for over a year.  The United States moves for dismissal because this case involves nonjusticiable political questions.

### BACKGROUND

**A.     Piracy Background**

Piracy has existed since the beginning of sea trade and is the reason the United States first created a standing Navy.  By the close of the 18th Century, the Barbary pirates of Northern Africa, who persistently attacked merchant ships, had become a major foreign-policy problem for our young country.  *See* A.B.C. Whipple, *To the Shores of Tripoli: The Birth of the U.S. Navy and Marines* 62 (1991).  Just five days after his inauguration in 1801, President Thomas Jefferson convened his Cabinet to discuss

1

sending armed forces to combat piracy.  In 1802, Congress passed an Act authorizing the

President to equip, staff, and employ armed vessels to protect merchant ships and seamen

from pirates.  *Id.* at 84.  The United States sent its small naval force, consisting of just six

frigates, to fight piracy.  According to scholarly views, the Navy's successful battle

against piracy showed the world that the United States was willing to fight for the

freedom of the seas and to stand up to tyranny.  *See, e.g.*, Joseph Wheelan, *Jefferson's

War: America's First War on Terror* 365-66 (2003).

International law condemns pirates as *hostis humani generis*, enemies of all

mankind.  *United States v. Dire*, 680 F.3d 446, 454 (4th Cir. 2012).  Piracy violates the

freedom of the high seas, a core principle of international law first codified in Hugo

Grotius's publication of *Mare Libernum* in 1609.  Piracy is a crime of universal

jurisdiction, subject to international prosecution under the law of nations.  *United States

v. Ali*, No. 12-3056, 2013 WL 2477029, at *4 (D.C. Cir. June 11, 2013); *Dire*, 680 F.3d at

469.

### B.    Modern Piracy

Piracy has resurged as a significant international problem in recent years, with

particularly high-risk areas off the coasts of Somalia (the Gulf of Aden), West Africa (the

Gulf of Guinea), and Southeast Asia (the Strait of Malacca).  Like their predecessors,

modern pirates threaten the freedom of navigation for United States shipping, the

international economy, and national security, particularly as modern piracy develops ties

to transnational criminal and terrorist organizations.  *See* James Kraska, *Contemporary

Maritime Piracy: International Law, Strategy, and Diplomacy at Sea* 48-50 (2011).

2

According to a report of the U.N. Secretary-General, there were 185 pirate attacks off the coast of Somalia in the first nine months of 2011.  (Ex. A, Secretary-General, *Rep. Pursuant to S.C. Res. 1950, delivered to the S.C.*, U.N. Doc. S/2011/662 (Oct. 25, 2011).) As of October 2011, 316 people and 15 vessels were being held hostage by Somali pirates.  *Id.* at 1.  This number was down from the 389 people held hostage in October 2010, a reduction the Secretary-General attributed to counter-piracy operations by naval forces in conjunction with improved security aboard merchant vessels.  *Id.* at 2.  The report noted that pirates were increasing their use of mother ships, "often retaining the captured crews on board as human shields."  *Id.* at 2.  The Secretary-General referred to Somali piracy as "a sophisticated organized crime," noting the pirates' "better and heavier weapons" in recent time.  *Id.*

C.    **International Counter-Piracy Operations**

Combatting piracy is an international effort.  As the Fourth Circuit stated, "in recent years . . . nations around the world have banded together to combat the escalating scourge of piracy."  *Dire*, 680 F.3d at 469.  With respect to the situation off the coast of Somalia, the United Nations Security Council has issued no fewer than ten Resolutions urging Member States to take action to combat piracy.  *See* www.un.org/Depts/los/piracy/ piracy_documents.htm.  For example, in June 2008, the U.N. Security Council took the extraordinary step of permitting the navies of U.N. Member States to enter the territorial waters of Somalia to repress acts of piracy.  (S.C. Res. 1816, ¶ 7, U.N. Doc. S/RES/1816 (June 2, 2008); continued in Res. 1838, 1846, and 1851.)

Near the time of the incident alleged here, the U.N. Security Council adopted Resolution 1976, expressing grave concern about the growing threat of piracy off the coast of Somalia.  (Ex. B, S.C. Res. 1976, U.N. Doc. S/RES/1976 (Apr. 11, 2011).)  The Resolution condemned the growing practice of hostage-taking by Somali pirates.  The Security Council called upon Member States to take part in the fight against piracy by deploying naval vessels, arms, and military aircraft, and to seize and dispose of boats, vessels, arms, and other equipment used by pirates.  *Id*. at 2.  The Security Council determined that Somali piracy constituted a threat to international peace.  *Id*. at 3.

As part of the international effort, the United States contributes resources to NATO's counter-piracy campaign, Operation Ocean Shield.  (Ex. A, ¶ 43; *see generally* www.mc.nato.int for information on Operation Ocean Shield.)  NATO is presently an alliance of 28 countries from North America and Europe.  Royal Netherlands Navy Commodore Michiel B. Hijmans commanded NATO counter-piracy Task Force 508 (NATO TF-508) from June 2010 to June 2011 and led Operation Ocean Shield from December 2010 to June 2011.

As Commodore Hijmans has noted, the pirates' use of fishing vessels as mother ships was a significant change in the pirates' strategy, leading to considerable successes for the pirates.  *See* Commodore Michiel B. Hijmans, *Africa: Threats of the Sea* (Nov. 1, 2011).[1]  Among the tactical advantages to the pirates of using a mother ship are the

---

[1]  *Available at* http://allafrica.com/stories/201111030907.html.  For additional information on NATO Operation Ocean Shield, see Commodore Hijmans's lecture at the Netherlands Peace Palace Library, *Fighting and Prosecuting Pirates* (Jan. 10, 2012) *available at* www.peacepalacelibrary.nl/library-services/activities/library-lectures.

ability to carry more pirates and more firepower than when traveling in smaller skiffs or whalers, including heavier, longer-range weapons such as rocket-propelled grenades. Mother ships allow pirates to remain far out to sea to hijack multiple merchant vessels in a single deployment of the pirate group. *Id.* Mother ships also give the pirates access to sophisticated radar equipment and other devices that allow for tactically beneficial situational awareness. *Id.* According to Commodore Hijmans, pirates operating a mother ship almost always deploy with hostages on board. *Id.*

### D.    Counter-Piracy Policies of the Executive and Legislative Branches

The U.S. Congress has acted upon its constitutional authority to "define and punish Piracies and Felonies committed on the high Seas." U.S. Const. art. I, § 8. Congress enacted the criminal piracy statute, 18 U.S.C. § 1651, which is the modern version of the piracy statute enacted on March 3, 1819. *Dire*, 680 F.3d at 452.

In its constitutional role as keeper of the national purse, U.S. Const. art. I, § 8, Congress funds the U.S. Navy's counter-piracy operations. For example, the National Defense Authorization Act, which funds military activities, specifically allows the Navy's use of resources to maintain capabilities including "the ability to operate in collaboration with the United States maritime partners in the common interest of preventing piracy at sea and maintaining the commercial sea lanes available for global commerce." Nat'l Def. Authorization Act for F.Y. 2013, Pub. L. No. 112-239, § 1017, 126 Stat. 1632.

In its constitutional role of advising the President on international relations, the Senate called on President Obama to "work with the international community and the

5

transitional government of Somalia to develop a comprehensive strategy to address both

the burgeoning problem of piracy and its root causes." (S. Res. 108, 111th Cong.

(2009).) Individual members of Congress have called upon the United States to fight

piracy. For example, U.S. Senator Mark Kirk discussed the Navy's actions against the

pirate mother ship at issue here, commenting that he had personally visited USS

STEPHEN W. GROVES in April 2011, shortly after USS GROVES had a previous

engagement with the very same pirate mother ship at issue in this case. 157 Cong. Rec.

S3150, 2011 WL 1899653 (May 19, 2011). Senator Kirk urged the Executive to adopt a

"more Jeffersonian policy" to eliminate the threat of piracy and the funding of terrorist

operations through pirates' ransoms. *Id.*; *see also* 157 Cong. Rec. S1173-01, 2011 WL

743997 (March 3, 2011) (Sen. Kirk urging firm action against pirates).[2]

Suppressing piracy has been, and continues to be, a concern at the highest levels of

the Executive Branch. In June 2007, President Bush adopted a policy for the repression

of piracy, declaring: "It is the policy of the United States to repress piracy." (Ex. C,

---

[2] *Accord, e.g.*, Statement of Sen. Kirk, 157 Cong. Rec. S1173-01 (daily ed. Mar. 3, 2011)
(calling for a "Decatur Initiative" against pirates, in honor of Stephen Decatur's daring
mission recapturing USS PHILADELPHIA from Barbary pirates); Statement of Rep.
Poe, 157 Cong. Rec. H1595-01 (daily ed. Mar. 3, 2011) (declaring that "we must do
everything in our power to stop the pirates off the Somalian coast"); Statement of Rep.
Ros-Lehtinen, 158 Cong. Rec. H7508-01 (daily ed. Dec. 31, 2012) (noting our alliance
with Turkey through NATO anti-piracy operations as a national security interest);
Statement of Sen. Kerry, *Confronting Piracy off the Coast of Somalia Before the S.
Comm. on Foreign Relations*, 111th Cong. 1 (2009) ("Piracy goes to the heart of national
security and economic interests"); Statement of Sen. Levin, *Ongoing Efforts to Combat
Piracy on the High Seas Before the S. Comm. on Armed Servs.*, 111th Cong. 2 (2009)
(commenting on "the value of the Armed Forces in confronting and stopping piracy");
Statement of Rep. LoBiondo, 112th Cong 1 (2011) ("[P]iracy cannot be tolerated by the
United States, I really think we need to re-emphasize that. We just cannot tolerate it.").

*Policy for the Repression of Piracy and Other Criminal Acts of Violence at Sea* (June 14, 2007).)  The policy incorporates international alliances through the following action: "[c]ontinue to lead and support international efforts to repress piracy and other acts of violence against maritime navigation and urge other states to take decisive action both individually and through international efforts." *Id*.  To implement this policy, the National Security Council set forth an Action Plan describing a tailored and detailed response to piracy off the Horn of Africa.  (Ex. D, U.S. Nat'l Sec. Council, *Countering Piracy off the Horn of Africa: Partnership & Action Plan* (Dec. 2008).)

President Obama reiterated this policy in a statement made after the hijacking of U.S.-flagged M/V MAERSK ALABAMA.  The President stated that "[w]e remain resolved to halt the rise of piracy in this region." *Pres. Statement on the Rescue of Capt. Phillips*, 1 Pub. Papers 475, 2009 WL 975799 (Apr. 12, 2009).  The President stated that the United States would continue to work with international partners to "be prepared to interdict acts of piracy." *Id*.  In 2010, President Obama declared a national emergency to deal with the threat caused by "the deterioration of the security situation and the persistence of violence in Somalia, and acts of piracy and armed robbery at sea off the coast of Somalia." Exec. Order No. 13,536, 75 Fed. Reg. 19,869 (Apr. 15, 2010).  The Executive Order was renewed in 2011, 2012, and 2013.  *See* 76 Fed. Reg. 19,897, 77 Fed. Reg. 21,839, 78 Fed. Reg. 21,013.  As Commander in Chief, the President declared that the persistent acts of piracy off the Somali coast posed "an unusual and extraordinary threat to the national security and foreign policy of the United States."  Message from the President to the Senate, 157 Cong. Rec. S2264-01, 2011 WL 1327560 (Apr. 7, 2011).

7

## FACTS

In the Complaint, Plaintiff alleges that JIN CHUN TSAI 68 was hijacked by pirates in March 2010.  (ECF No. 1, ¶ 6.)  The pirates lived on the vessel for the next year.  *Id.* ¶¶ 6, 7, 30.  On May 10, 2011, USS STEPHEN W. GROVES approached JIN CHUN TSAI 68.  The pirates' skiffs were out of the water, stowed on the bow of the pirates' mother ship.  *Id.* ¶ 17.  USS GROVES contacted the pirate ship at 6:16 a.m. local time.[3]  *Id.* ¶¶ 9, 15.  USS GROVES issued verbal warnings and fired warning shots.  *Id.* ¶¶ 15, 16.  USS GROVES then fired at the skiffs stowed on the bow of the pirate ship from a distance of 1000 to 1400 yards away.  *Id.* ¶¶ 17, 21.  The pirates surrendered, and when the Navy boarded the pirate ship, the boarding team found that Wu Lai-Yu had been killed by the gunfire.  *Id.* ¶ 23.  The crew performed a service for burial at sea and laid Wu Lai-Yu to rest in JIN CHUN TSAI 68, which was sunk as a hazard to navigation.  *Id.* ¶¶ 24-25.

Plaintiff filed an administrative claim with the U.S. Navy and attached to the claim a Navy report of the incident.  *Id.* ¶¶ 32, 33.  The following details are contained in that report.  (Ex. E, Unclassified Investigation Report.)

At the time of the counter-piracy operation, USS GROVES was part of a NATO-led counter-piracy operation under NATO Commander Task Force 508 (NATO CTF-508), supporting NATO's Operation Ocean Shield to suppress piracy off the Horn

---

[3]  Although Plaintiff alleges the initial contact was 2:16 a.m. local time (ECF No. 1 ¶ 15), the times given in the investigation were in Coordinated Universal Time (a/k/a Zulu time), which is four hours earlier than local time.

of Africa.  (Ex. E at 1.)  From March 2010, JIN CHUN TSAI 68 was a Somali pirate mother ship.  *Id*. at 2.  As part of the counter-piracy operation, NATO CTF-508 directed USS GROVES to force the pirate mother ship to stop and surrender, using force if necessary.  *Id*. at 2-5.  In accordance with the plan approved by NATO CTF-508, USS GROVES employed a graduated use of force to compel the pirates to surrender, including verbal warnings, warning shots fired forward of the bow, and then rounds fired to disable the pirate skiffs stowed on the mother ship's bow.  *Id*. at 2-5.  After the first rounds were fired at the skiffs, the Commanding Officer of USS GROVES directed a cease fire.  *Id*. at 3.  The pirates fired back at USS GROVES with their weapons.  *Id*. at 4.  USS GROVES responded to this attack with additional shots at the skiffs on the bow.  *Id*. at 4.  Only after this exchange of fire did the pirates surrender.  *Id*. at 4.  There were a total of twenty-two pirates on the mother ship along with Wu Lai-Yu and two other hostages (who were rescued).  *Id*. at 4.

The actions of USS GROVES were directed by the Commander of NATO CTF-508 and complied with the NATO Rules of Engagement.  *Id.* at 1-5, 10.  This was not the first time NATO CTF-508 had directed USS GROVES to take action against this particular mother ship — on an earlier date, NATO CTF-508 had directed USS GROVES to fire at the skiffs of JIN CHUN TSAI 68 when JIN CHUN TSAI 68 was being towed by another pirate command ship, the hijacked M/V ROSALIA D'AMATO.  *Id*. at 9.

The Commander of NATO CTF-508 approved USS GROVES's plan of action for May 10, 2011, against the mother ship, and gave further real-time direction throughout the engagement.  *Id*. at 1-5, 10.  USS GROVES was operating under NATO's rules of

engagement.  Those rules required USS GROVES to keep in mind minimizing the risk of loss of human life and collateral damage.  *Id*. at 13.  The Commander of NATO CTF-508 suggested that USS GROVES not announce the proposed location to be fired upon because of the possibility that the pirates would move the hostages to that location as human shields.  *Id*. at 3.

After the pirates raised their arms in surrender, a team from USS GROVES boarded the mother ship and found a substantial combat arsenal, including rocket-propelled grenade launchers and grenades, heavy machine guns, AK-47 assault rifles, and ammunition.  *Id*. at 4-5.  The Navy's inquiry concluded that Wu Lai-Yu was killed inadvertently by ordnance used to defeat the pirate mother ship and disable their skiffs. *Id*. at 11.  Three of the twenty-two pirates were killed; two hostages were rescued.  *Id.*

Given JIN CHUN TSAI 68's condition following its exchange of fire with USS GROVES, NATO CTF-508 determined that JIN CHUN TSAI 68 was unseaworthy and ordered her sunk.  *Id*. at 1, 5.  NATO CTF-508 further directed that Wu Lai-Yu's body be returned to the vessel for burial at sea.  *Id.*

## ARGUMENT

The United States brings this motion to dismiss under Rule 12(b)(1).  The plaintiff bears the burden of establishing subject matter jurisdiction.  *Smith v. Wash. Metro. Area Transit Auth*., 290 F.3d 201, 205 (4th Cir. 2002).  In considering a Rule 12(b)(1) motion challenging the factual basis for subject matter jurisdiction, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."

*Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  The court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.*

I.      **The *Baker v. Carr* Factors Apply Here.**

The political question doctrine is a function of constitutional separation of powers. It "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).  In *Baker v. Carr*, the U.S. Supreme Court set forth six formulations, any *one* of which indicates a nonjusticiable political question:

> (1) A textually demonstrable constitutional commitment of the issue to a coordinate political department; or
>
> (2) A lack of judicially discoverable and manageable standards for resolving it; or
>
> (3) The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
>
> (4) The impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or
>
> (5) An unusual need for unquestioning adherence to a political decision already made; or
>
> (6) The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  Most, if not all, of the *Baker v. Carr* characteristics are present in this lawsuit.

## II.     The Challenged Acts Were Committed to the Political Branches.

The Constitution contains a textually demonstrable commitment of counter-piracy measures to the Executive and Legislative Branches.  The Constitution grants Congress the power to punish piracy on the high seas.  U.S. Const. art. I, § 8.  The Constitution further confers upon Congress the power to provide for, organize, arm, maintain, and govern the military.  U.S. Const. art. I, § 8, cls. 11-16.

The Constitution provides that the President shall be the Commander in Chief of the Army and the Navy.  U.S. Const. art. II, § 2; *see also United States v. Stanley*, 483 U.S. 669, 682 (1987) (noting that the Constitution grants authority over the military to the political branches).  As part of the executive power vested by the Constitution, the President bears the "vast share of responsibility for the conduct of our foreign relations" and accordingly holds "independent authority 'in the areas of foreign policy and national security.'"  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, 429 (2003).

The alleged acts took place in the context of a NATO mission and pursuant to the North Atlantic Treaty.  The Treaty Clause of the Constitution vests treaty authority in the political branches:  "[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."  U.S. Const. art. II, § 2.  The North Atlantic Treaty was ratified by the Senate in 1949 and remains in effect today.  The Legislature and the Executive have the constitutional authority to support and enforce the treaty, including funding (Legislature) and providing our military assets (Executive) for NATO operations.

12

Plaintiff's claim calls into question the U.S. Navy's actions taken to combat piracy through a long-standing international alliance. The Complaint challenges the Commander in Chief's use of naval forces in support of U.N. Security Council Resolutions and NATO Operation Ocean Shield. The Complaint challenges the tactical military decisions made by a commissioned U.S. Navy officer under the operational command of a NATO commander in accordance with the strategic counter-piracy mission assigned by the Commander in Chief. The acts challenged here have been constitutionally committed to the political branches, thus satisfying the first – and most important – *Baker v. Carr* characteristic. The fact that the text of the U.S. Constitution explicitly commits counter-piracy, military command, and treaty authority to the political branches lends overwhelming support for the nonjusticiability of this action. Despite the deeply sympathetic nature of this action and the undeniable hardships suffered by Wu Lai-Yu during his piracy ordeal, the commitment of these issues to the political branches removes this case from the realm of actions that may be considered by the courts.

## III.    Military Strategy and Tactics Are Not Subject to Judicial Review.

Lending further support to the nonjusticiability of this action, claims that require a court to evaluate the Executive's military strategy, tactical decision-making, or calculated operations bear the hallmarks of a nonjusticiable political question. *See Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997). "In military matters in particular, the courts lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010). The "complex,

13

subtle, and professional decisions as to the . . . control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." *Id.* (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

In this Circuit, the Court of Appeals held that a civilian death caused by defensive military operations in U.S. airspace was not justiciable. *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).  That case arose when a small private airplane collided with a military fighter jet that was dispatched to identify the private airplane.  The pilot's widow in *Tiffany* brought her lawsuit under the Suits in Admiralty Act and the Death on the High Seas Act.  931 F.2d at 272.  In that case, the district court entered judgment in favor of the plaintiff.  The Court of Appeals reversed, ruling that considering the merits of the claim violated the separation of powers, as the military's actions were delegated to the political branches of the government.  "The decisions whether and under what circumstances to employ military force are constitutionally reserved for the executive and legislative branches." *Id.* at 277.  The court held that judicial examination was precluded because, among other things, the case required an examination of professional military judgments. *Id*.

The plaintiff in *Tiffany* argued that her claim was justiciable because the military allegedly violated its regulations, manuals, and procedures. *Id*. at 279.  The Court of Appeals rejected this argument, ruling that the military had freedom to design and conduct missions without fear that courts would later assess damages if the mission could have been accomplished better.  The internal military directives did not guarantee safety of civilians or create a tort duty. *Id*. at 280-81.  Rather, the regulations left discretion to

14

the military, further indicating that the military's conduct was "best left to those branches of government whose expertise is greater and whose political accountability is more direct." *Id*. at 282.

In a similar decision concerning military decision-making, the U.S. Court of Appeals for the D.C. Circuit ruled that the political question doctrine rendered nonjusticiable a tort challenge to the President's decision to launch an airstrike on a foreign target. *El-Shifa*, 607 F.3d at 844. The plaintiffs in *El-Shifa* sought compensation after the United States destroyed their pharmaceutical plant in Sudan with a missile strike. Although the plaintiffs argued that the missile strike was "mistaken and not justified," the Court of Appeals declined to "fashion[] out of whole cloth some standard for when military action is justified." *Id.* at 845.

The Eleventh Circuit reached the same decision in a case involving the alleged wrongful death and personal injury of Turkish sailors after the United States accidentally struck their vessel with a missile in a NATO training exercise. *Aktepe*, 105 F.3d at 1401. The plaintiffs in *Aktepe* brought suit under the Public Vessels Act, among other statutes. In finding their claims to be nonjusticiable, the court ruled that "[t]he interjection of tort law into the realms of foreign policy and military affairs" would effectively permit judicial reappraisal of judgments the Constitution committed to the other branches. *Id*. at 1404 (citing *Tiffany*, 931 F.2d at 278). The court concluded, "[t]his case presents a nonjusticiable political question because it would require a court to interject itself into military decisionmaking and foreign policy, areas the Constitution has committed to coordinate branches of government." *Id*.

15

The political question doctrine does not apply to all cases involving the military. As the court in *Tiffany* stated, "[w]e do not hold, of course, that any time a branch of the military asserts a national defense interest to justify its acts, the court must avert its eyes." *Tiffany*, 931 F.2d at 280.  In a recent case in New York, for example, the district court held that the political question doctrine did not bar a slip-and-fall action against a civilian contractor that built and maintained a latrine facility in Iraq.  *Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 709 (S.D.N.Y. 2011).  The court found that washing the latrine floor did not implicate military decision-making.  Similarly, the Ninth Circuit declined to apply the political question doctrine to bar a lawsuit filed against the United States and private contractors after a U.S. warship mistakenly downed a civilian aircraft, instead dismissing the action under the combatant activities exception to the Federal Tort Claims Act.  *Koohi v. United States*, 976 F.2d 1328, 1336 (9th Cir. 1992).[4]

Thus, even in a military context, the political question doctrine requires a focus on the *nature of the challenged act* to determine whether a political question will emerge if the case goes to trial.  For example, the Eleventh Circuit affirmed the district court's dismissal on political question grounds in a case challenging discretionary military decisions leading up to an accident in a convoy in Iraq that killed an Army sergeant.  *Carmichael v. Kellogg, Brown & Root Servs*., 572 F.3d 1271, 1281 (11th Cir. 2009).  Although the widow's allegations sounded in tort – the military contractor drove too fast

---

[4]  The Ninth Circuit in *Koohi* held that the combatant activities exception to the Federal Tort Claims Act applies to cases brought under the Suits in Admiralty Act and the Public Vessels Act.  The Fourth Circuit has not reached this issue and the Court need not do so in this case because the political question doctrine bars this action.

for the turn, causing the tanker truck to overturn – the court ruled that the allegations

would have required an analysis of military decision-making, including planning and

executing the convoy.  *Id*.  Thus, washing a latrine floor without posting a "slippery when

wet" sign did not implicate military decision-making, even though the latrine was in a

combat zone, *Aiello*, 751 F. Supp. 2d at 706, but tactical decisions of a military convoy

did implicate military decision-making, and were thus nonjusticiable, *Carmichael*, 572

F.3d at 1282.

 The *Carmichael* court declined to accept the plaintiff's argument that her case was

like *Koohi* because she sought only monetary damages.  *Id*. at 1392.  Rather, the

*Carmichael* court found that the widow's suit would require it to issue a decision on

military matters for which it lacked standards to rule, an issue that was not considered in

*Koohi*.  Indeed, given developments in the political question doctrine since 1992, it

appears *Koohi* was wrongly decided.  *See generally* Barbara B. Hillson, *Koohi v. United*

*States: The Ninth Circuit Leads Federal Jurisdiction into Battle*, 28 Ga. L. Rev. 269

(1993) (arguing that the *Koohi* court wrongly decided not to apply the political question

doctrine).  For example, the *Koohi* court primarily relied on cases involving peacetime

operations as opposed to actions taken in the context of a military conflict.  *Id*. at 283-89;

*see also McMahon v. Presidential Airways, Inc*., 460 F. Supp. 2d 1315, 1321-22 (M.D.

Fla. 2006) (declining to follow *Koohi* because the *Koohi* court did not focus on the legal

aspect of challenging combat-like activity).

 In a case similar to *Carmichael*, the Fourth Circuit recently reaffirmed the

applicability of the political question doctrine to bar an action against a private contractor

17

for alleged negligent electrical work in Iraq.  *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402 (4th Cir. 2011).  The plaintiff, a serviceman in Fallujah, was injured by the contractor's alleged negligence in turning on a generator while the plaintiff was performing electrical repairs at a tank ramp.  The district court granted the contractor's motion to dismiss under Rule 12(b)(1), ruling that the political question doctrine barred the action.  *Id.* at 406.  The Fourth Circuit affirmed, ruling that it lacked "manageable standards for evaluating how electrical power is supplied to a military base in a combat theatre" or who should be authorized to work on the generators.  *Id.* at 412 n.13.  The court found that exercising jurisdiction over the case would require it to question "actual, sensitive judgments made by the military" and that assessing such judgments in a tort context "would show a lack of respect for the executive branch."  *Id.*

The decisions challenged here fall within the political question doctrine because a trial in this case would require examination of the military's tactics, strategies, and decision-making.  This is particularly true because the challenged decisions were made under the authority of NATO commanders and in support of U.N. Security Council Resolutions during a time of military action against an armed enemy.  The tactical considerations of the officers aboard USS GROVES, and those to whom they reported, are far different from the considerations of a private contractor performing custodial services in a latrine facility.  As in *Carmichael* and *Taylor*, if this case went to trial, the judiciary would need to assess military judgments, including counter-piracy rules of engagement, which include classified information.  Other military tactics and strategies at issue in this case include the selection of weaponry and ammunition, the separation

distance to keep out of the pirates' range of fire, NATO's decision not to announce the aim point of fire in response to the pirates' use of hostages as human shields, classified intelligence about the pirates' operations, acceptable levels of risk in the opinion of commanding officers, the risk of the pirate ship ramming or otherwise attacking the frigate, the location and speed of the vessels, and the larger military situation, including proximity to pirate reinforcements or the Somali coast.

A trial in this case would hinge on an analysis of proportional use of force and the precautions taken to minimize loss of civilian life.  Plaintiff argues that the NATO operation failed to take the best, most exhaustive steps to avoid civilian casualties, yet the military commanders on scene had to balance competing factors in making discretionary tactical decisions, as discussed above, and the investigation found that the operation complied with the rules of engagement.  The complexities of this analysis highlight the nonjusticiability of this action.

With respect to the sinking of the mother ship and the disposition of Wu Lai-Yu's body, those decisions were made in the framework of an international military alliance and also concern military judgment, tactics, and capabilities.  The Complaint alleges that USS GROVES "willfully destroyed" the pirate mother ship.  (ECF No. 1, ¶ 47.)  The vessel was sunk upon the order of the NATO commander and in compliance with U.N. Security Council resolutions.  NATO command made the intentional and operational decision that sinking the damaged pirate ship was the proper course of action.  NATO command also made intentional decisions about the bodies of the deceased pirates and the burial of Wu Lai-Yu.  Analysis of these decisions would require assessment of the

North Atlantic Treaty Organization's orders to a military unit involved in ongoing counter-piracy operations, as well as the mission and capabilities of USS GROVES.

At the time of the conflict, JIN CHUN TSAI 68 was a captured pirate ship. United Nations Security Council resolutions in effect at the time called upon Member States "to take part in the fight against piracy," through, among other things, "*seizures and disposition* of boats . . . used in the commission of piracy and armed robbery at sea off the coast of Somalia, or for which there are reasonable grounds for suspecting such use." (Ex. B, S.C. Res. 1976 at 2, emphasis added.) Such decisions about the seizure and disposition of pirate ships are not suitable for assessment in the tort context. To the contrary, sensitive military judgments such as how to dispose of damaged pirate vessels, and with which military units, are left to the discretion of the political branches of the government and are not justiciable.

## IV.   Plaintiff's Tort Allegations Do Not Make This Case Justiciable.

The so-called tort analysis of this case is inseparable from the analysis of military decision-making, including the decision to fire on the mother ship and the disposition of the ship and the body of the decedent. The fact that some of the allegations are of intentional torts supports the nonjusticiability of this action, as Plaintiff challenges the authority and execution of intentional military orders.

*Tiffany*, *Aktepe*, *Taylor*, and *El-Shifa*, all of which are on point, were filed as tort actions before being dismissed as nonjusticiable. In *Tiffany*, the Fourth Circuit held that the plaintiff "cannot reshape the national response to threats of hostile air attack through the mechanism of tort law." *Id*. at 278. The court cautioned against the "myriad

possibilities for mischievous judicial inquiry" of the military's decisions should the case proceed as a tort action.  *Id.* at 279.  The court declined to apply tort concepts to military action, as "[a]ny judgment we might render would lay upon NORAD [North American Aerospace Defense, joint Canadian-U.S. organization] a strata of tort law which would be both capricious and confining in its impact."  *Id.*

While the court is the proper place to bring an ordinary tort lawsuit, the present case is not an ordinary tort lawsuit, given the circumstances in which USS GROVES took action against the pirate mother ship.  The analysis of this purported tort action would intrude into the province of the Executive Branch, especially as such scrutiny would apply to the orders of commissioned naval officers and NATO commanders during a time of military action.  These allegations would require the Court to examine the appropriateness of the classified rules of engagement and the orders given to USS GROVES by the NATO commander, which are affairs outside the realm of the judiciary. *See generally* Wright & Miller, Federal Practice & Procedure, § 3534.2 (discussing application of political question doctrine to matters of military action, foreign affairs, and treaties).  If this case went to trial, one of the most fundamental elements of military command and authority would be on trial – the acceptable level of risk for a combat engagement.  Accordingly, the political question doctrine bars this action.

## V.   This Case Involves Nonjusticiable Foreign Relations.

Disputes involving foreign relations are "quintessential sources of political questions." *El-Shifa*, 607 F.3d at 841.  Foreign policy concerns are present here, due to the United States' decision to support international counter-piracy efforts by providing

military support.  These concerns implicate *Baker v. Carr* factors five and six, given the "potential of embarrassment" should the Court make pronouncements on already-made U.S. and NATO decisions concerning the suppression of piracy.

The foreign relations of NATO further highlight the nonjusticiability of this action.  The United States chose to join with its allies to fight piracy, and did so through NATO command.  Scrutinizing NATO military operations in the tort context could cause international embarrassment and undermine U.S. foreign relations.  As the Eleventh Circuit ruled in *Aktepe*, concerning a NATO training incident, "[t]he relationship between the United States and its allies, like the broader question of which nations we number among our allies, is a matter of foreign policy."  *Aktepe*, 105 F.3d at 1403.  The court continued:  "As courts are unschooled in 'the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international conflict,' the Constitution entrusts resolution of sensitive foreign policy issues to the political branches of government."  *Id*. (quoting *Smith v. Reagan*, 844 F.2d 195, 199 (4th Cir. 1988)).  As in *Aktepe*, the Court here lacks justiciability over the Complaint because resolution of sensitive foreign policy issues has been constitutionally delegated to the political branches.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Complaint be dismissed.  Fed. R. Civ. P. 12(b)(1).

Dated:  July 9, 2013

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

ROD J. ROSENSTEIN
United States Attorney

JOSEPH BALDWIN
Assistant United States Attorney


By:      /s/ Jill Dahlmann Rosa
JILL DAHLMANN ROSA
THOMAS M. BROWN
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
Aviation & Admiralty Litigation
P.O. Box 14271
Washington, DC 20044-1471
Jill.Rosa@usdoj.gov
Thomas.M.Brown@usdoj.gov
(847) 732-1141 (Rosa)
(202) 616-4033 (Brown)
(202) 616-4002 (fax)

Of Counsel:

Lieutenant Mark deVry
Office of the Judge Advocate General
United States Navy
Washington, D.C.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of July, 2013, a copy of the foregoing was

electronically filed in this case, which was served electronically on:

*Counsel for Plaintiff:*

Timothy B. Shea
Nemirow Hu & Shea
1900 L Street, N.W.; #303
Washington DC 20036
Tel: 202-835-0300
Fax:  888-522-4519
E-mail:  timbshea@aol.com

 /s/  Jill Dahlmann Rosa
Jill Dahlmann Rosa
United States Department of Justice
