In the

United States District Court
for the District of Maryland

| | | |
|---|---|---|
| Wu Tien Li-Shou, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:13 cv 01366 JFM |
| | ) | |
| United States of America, | ) | |
| Defendant. | ) | |

**Plaintiff's Opposition to Motion to Dismiss**

The Government urges that the Complaint is non-justiciable under the political question doctrine because it would challenge decisions made by a commissioned U.S. Navy officer involved in counter piracy activities, would intrude into the province of the Executive branch particularly as to the orders to commissioned naval officers, and would require the Court to examine the propriety and execution of the U.S. Navy rules of engagement with pirates.

The Government Memorandum in Support of Motion to Dismiss ("Government Memorandum") fails to acknowledge that the Public Vessel Act, 46 U.S.C. §§ 31104 *et seq.* (formerly 46 U.S.C. App. §§781 *et seq.*) ("PVA") was expressly intended to cover claims arising from the actions of naval vessels; that discovery against officers and members of the crew of any public vessel is addressed by the law; or that a century of precedent accumulated under that law permitted cases against U.S. Navy vessels even in time of war. The Government argument would eviscerate neatly a large portion of the PVA and the robust case law applying it, without ever acknowledging its extraordinary effect.

1

More specifically, the PVA has been long understood to represent a commitment to the judiciary of damage claims arising out of the activities of naval vessels on the high seas. The PVA arose out of the inadequacy of the waiver of sovereign immunity as to Government merchant vessels incorporated in the Shipping Act of 1916. After the 1920 Suits in Admiralty Act failed to provide complete relief to injured ship owners, Congress passed the PVA in 1925 precisely to address claims arising out of conduct of U.S. Navy vessels even making it five years retroactive.

Moreover, the Constitutional grant of jurisdiction to the judiciary in "all cases of admiralty and maritime jurisdiction," U.S. Constitution Act. III, §2, clause 1 and the U.S. Code at 28 U.S.C. §1333, has long been understood to authorize review of decisions made by naval forces on the high seas even in the course of war. In adjudicating prize cases, for example, the courts have entertained legal challenges to the condemnation of vessels taken as prizes by U.S. Navy forces during war time. The Supreme Court has been untroubled by objections that its action might unduly intruding into decisions of the Executive based on the historic authority of the court under the Constitutional grant of admiralty jurisdiction.

This circuit's careful discussion in *McMellon v. United States*,  387 F.3d 329 (4th Cir. 2004)(*en banc*), importing the discretionary function into the Suits in Admiralty Act, implicitly rejected the claim by taking jurisdiction over an analogous claim against the Government without any discussion of the political question doctrine. The political question precedent from other circuits relied upon by the Government, therefore, have no support in the Fourth Circuit.

2

Here, the challenged act was a routine police action in which a 453 foot naval frigate armed with all the weaponry available to the U.S. Navy surprised a 27 meter fishing vessel at night and opened fire moments after identifying itself in languages the fishing vessel crew may not have heard or comprehended. The Navy vessel grossly violated the straightforward directives governing its action recklessly endangering the lives of the innocent hostages by firing at distances so remote that the fire could not be controlled, thereby turning the fire onto the vessel itself,  and inexplicably using exploding ammunition, rather than inert. The precedent dealing with the obligation of rescuers, including Government actors, not to worsen the plight of victims at sea, well recognized in this circuit and throughout the country, can be applied to this scenario and disproves the Government's claim of judicial unmanageability.

## I.      Background

The actions complained of herein took place on the high seas within the admiralty and maritime jurisdiction of this court.

### A.  Facts

This action could never be characterized as anything but a routine naval police action. Plaintiff challenges many of the various characterizations of the facts in the Government Memorandum. The assertion that the U.S. Navy after action investigation found that the naval commander "complied with the rules of engagement," Government Memorandum at 19, is specifically contradicted by the Complaint at paragraphs 17 - 28. [1] Likewise, the claim that

---

[1]  The US Navy investigation found that the *USS Stephen W. Groves* ("SWG"): underestimated the difficulty of hitting the intended target at a range of 1000 yards and therefore underestimated the risk to persons aboard the JCT 68; contrary to applicable tactical instructions the SWG did not specifically warn the JCT which portions of the boat were going to be targeted with fire; the SWG employed 25 mm high explosive rounds of vice inert or ball type ordinance for non-

Master Wu was "killed in a crossfire", Government Memorandum at 1 and 10, is also disputed. Plaintiff denies that there could have been crossfire as the small arms available to the fishing vessel pirates are known to have had ranges of less than 300 yards, well short of the distance separating the vessels; and Plaintiff seeks discovery as to whether there was any fire from the fishing vessel at all. Plaintiff also denies that the fishing vessel could be a hazard to navigation and that the Navy officer made any such determination prior to ordering it sunk. To the extent that these disputed facts may bear on the outcome of the Motion, Plaintiff is entitled to discovery on the disputed issues.

The Navy vessel, *USS Stephen W. Groves* ("SWG"), a 453 foot frigate with a crew of over 200 equipped with essentially every armament available to the U.S. Navy, precipitated a nighttime surprise approach on a 27 meter fishing boat under the command of suspected pirates equipped with small arms. Unmistakable evidence even from the Navy after action investigation demonstrates that the on-site commander conspicuously failed to take reasonable measures to protect the lives and property of innocent hostages by, for example, using exploding ordinance on the fishing boat rather than inert ordnance and firing into central compartments rather than at the skiffs on the bow or the boat's engines. Innocents, including Plaintiff's husband, Master Wu, paid the price with their lives.  Even after all of suspected pirates had surrendered and with the fishing boat floating safely alongside the SWG for more than a day, the naval commander ordered the fishing boat to be sunk without any consideration of the rights of the boat owners or the remains of Master Wu.

---

disabling fire; contrary to tactical guidance the SWG employed disabling fire from 1400 yards vice 1000 yards; the range of fire made observation of people on the SWG difficult; the SWG did not fully appreciate or express concern regarding the risks to civilians from fire directed at the skiffs. See Government Memorandum, Exhibit E at 10, 11.

Plaintiff in this action is the wife and legal representative of Wu Lai –Yu, the master and operator of the 27 meter long fishing vessel JIH CHUN TSAI 68 ("JCT 68") which carried a crew of some ten sailors plying the Pacific and Indian Oceans for fish. Complaint ¶ 5. In early March, 2010 the JCT 68 was taken over by Somali Pirates in the Indian Ocean. The Somali Pirates through an intermediary contacted Plaintiff Wu to discuss release of the vessel and the crew. Complaint ¶ 6 - 8.

On May 10, 2011 the SWG, operating in the Gulf of Aden in support of certain NATO activities, approached the JCT 68 on the high seas. The U.S. Navy chain of command maintained control of the SWG operations at all times. The U.S. chain of command through Destroyer Squadron 2 advised SWG against the use of disabling fire with respect to the JCT 68 because of the risk to civilians on board. Complaint ¶ 11.

When the SWG initiated contact with the JCT 68, the SWG enjoyed complete freedom of action with respect to the JCT 68. At no time did the JCT 68 seek to initiate a threat of piracy to the SWG. Complaint ¶ 12.

On May 9, 2011, the SWG adopted a plan to rescue Master Wu and his crew under which the SWG would first give verbal warnings to the JCT 68 and then, as necessary, follow-up with bracketing fire to pacify the suspected pirates aboard. U.S. Navy instructions on engagement of suspected pirate vessels mandated notice of the Navy intentions followed by incremental non-disabling fire. These instructions made consideration of the welfare of innocents aboard the vessels to be paramount.  A separate protocol with separate warnings were required before use of disabling fire was authorized and such fire was required to be limited to stern engines, not passenger accommodations. Complaint ¶ 14.

SWG initiated its contact with the JCT 68 at 2:16 in the morning, local time. After giving verbal warnings via the VHF radio to the JCT 68 in English and Somali, but not Chinese Mandarin, and flashing lights and blowing whistles for several minutes, the SWG fired warning shots forward of the JCT 68's bow and gave additional verbal warnings via VHF radio. Complaint ¶ 13 -15.

After SWG positioned itself 1000 yards away from the JCT 68's starboard beam, it fired machine guns in the direction of the JCT 68, intending to strike forward of the boat and then intending to deliberately walk the fire onto the skiffs resting on the bow of the JCT 68. Rather than striking forward of the JCT 68, some of the fire hit the vessel on the starboard side amidships, well aft of the bow. The SWG did not pause at that point to assess the damage done to the JCT 68 or to the reaction of the suspected pirates to the fire. Instead, undeterred by the first firing error, the SWG fired more rounds of machine gun fire on the JCT 68. The SWG then moved 1400 yards away from the JCT 68. At 3:09 AM the SWG fired more machine gun rounds on the JCT 68 purportedly aimed at the skiffs on the boat's bow. U.S. Navy instructions explicitly forbade disabling fire on the bow of a suspected pirate vessel to avoid injury to innocent victims. Complaint ¶ 17 -21.

At that point the suspected pirates assembled on the ship's bow indicating a willingness to surrender. The SWG crew directed the pirates and two unharmed crewman of the JCT 68 to debark the JCT 68 into one of the SWG's launches. The SWG's boarding crew boarded the JCT 68 where it discovered four dead, Master Wu as well as three suspected pirates. In addition, the crew discovered two suspected pirates injured from gunfire. Master Wu was found in his sleeping quarters amidships with the crown of his head removed by the SWG's gunfire. Two other dead were found forward of the pilot house. Complaint ¶ 22 – 23; Government

Memorandum, Exhibit E at 5. The SWG fire directly injured Master Wu, the JCT 68, and its cargo. Complaint ¶ 24.

After taking Master Wu's remains on the SWG, the next day the SWG crew returned the remains to the JCT 68. After a short burial service, the SWG fired upon the JCT 68 using close in weapon systems sinking the JCT 68 with Master Wu's body on board. Complaint ¶ 24.

The SWG made no assessment of the seaworthiness of the JCT 68 after the surrender of the pirates. The SWG did not seek nor did it obtain authorization for firing upon Master Wu's remains or the JCT 68. The JCT 68 was, in fact, seaworthy after the surrender of the pirates. At that point the JCT 68 was no longer in possession of pirates so the Navy had no authority to command the JCT 68. The SWG ignored the appeals of the surviving JCT 68 crew members that the vessel be towed back to shore or that they may be allowed to navigate the vessel. The decision to sink the JCT 68 was unauthorized and irrational. Complaint ¶ 25, 27.

The SWG later set the suspected pirates free without ever arranging for any trial or other judicial proceedings. Complaint ¶ 29.

A Navy investigation of the incident, a copy of which is attached to the Government Motion to Dismiss as Exhibit E, concluded that the SWG violated a score of specific directives in this approach and that these violations led to the fatal injury of Master Wu, his crew, and the loss of the boat. [2] Complaint ¶ 32.

---

[2] The violations included : the SWG underestimated the difficulty of hitting targets at its chosen range of engagement; the SWG wrongly employed high explosive rounds rather than inert ordinance; the SWG's use of inaccurate manually controlled weapons from 1000 yards or more; the SWG's use of an anti-aircraft gatling gun against a small vessel was starkly disproportionate; the range of engagement made observation of the JCT 68 difficult, particularly the essential ability to discern people on board; the SWG failed to provide any advance notice to the JCT 68's

## B.  Admiralty Jurisdiction of this Court

The Constitution grants to United States District Courts jurisdiction in "all cases of admiralty and maritime jurisdiction." U.S. Constitution Art. III, §2, clause 1. In 28 U.S.C. §1333 the District Courts are given original jurisdiction of "any civil case of admiralty or maritime jurisdiction." See Complaint ¶ 1.

The Supreme Court has been very protective of federal common law jurisdiction for admiralty and maritime cases. See *New Jersey Steam Navigation Co. v. Merchants' Bank of Boston*, 47 U.S. 344, 390 (1848) ("By the Constitution, the entire admiralty power of the country is lodged in the federal judiciary, and Congress intended by the ninth section to invest the District Courts with this power, as courts of original jurisdiction. The term 'exclusive original cognizance' is used for this purpose, and is intended to be exclusive of the state, as well as of the other federal courts."); *Norfolk So. Ry. Co. v.  Kirby*, 543 U.S. 14, 23 (2004); *Atlantic Sounding, Co. v. Townsend*, 557 U.S. 404 (2009) (discussing the common law purview of court in upholding availability of punitive damages to seamen willfully denied maintenance and cure); *Kiobel v. Royal Dutch Petroleum, Co.*, 133 S. Ct. 1659 (2013) (application of U.S. law to pirates not at odds with general presumption against extraterritoriality of U.S. law); *Lozman v. City of Rivera Beach,* 133 S. Ct. 735 (2013).

The federal courts have applied admiralty and maritime jurisdiction broadly. The status of prize vessels captured during belligerency, the War of 1812, was held subject to court jurisdiction notwithstanding the sovereign interests arising out of the capture of a commissioned

---

vessel registry authorities or to the Government of the Republic of China (Taiwan) of its aggressive intentions and to learn of the status of any negotiations as to freeing the vessel and Master Wu; the SWG failed to take into account the risk to people aboard the JCT 68 contrary to Navy rules; and the SWG failed to contact JCT 68's vessel registry authorities and Republic of China (Taiwan) authorities immediately after the engagement to permit sailors or commercial surveyors to recover and preserve the JCT 68. Complaint ¶ 32.

ship. *L'Invincible,* 14 U.S. 1, 1 Wheat 238, 257, 258 (1816) ("Every violent dispossession of property on the ocean is *prima facie* a maritime tort; as such, it belongs to the admiralty jurisdiction."). [3] In *The Paquete Habana*, 175 U.S. 677, 712 (1900) the Supreme Court took jurisdiction over the U.S. Navy's wartime seizure and condemnation of fishing vessels operated by foreign belligerents and rejected the Government action as improper under international maritime law. Acknowledging the declaration of war and the 1898 proclamation of the President to pursue the conflict, the Court considered that "the proclamation clearly manifested the general policy of the Government to conduct the war in accordance with the principles of international law sanctioned by the recent practice of nations." *Id.* at 712. The Court reaffirmed its prior statement that the usages of the sea and ordinances of maritime states have constituted "by common consent of mankind … rules that have been acquiesced in as of general obligation." See also *Skiriotes v. Florida,* 313 U.S. 69, 72-73 (1941)( **"**International law is a part of our law and as such is the law of all States of the Union, but it is a part of our law for the application of its own principles, and these are concerned with international rights and duties and not with domestic rights and duties.") (citations omitted).

─────────────────────

[3] The court noted:

> That the mere fact of seizure as prize does not, of itself, oust the neutral admiralty court of its jurisdiction is evident from this fact, that there are acknowledged cases in which the courts of a neutral may interfere to divest possessions -- to-wit, those in which her own right to stand neutral is invaded -- and there is no case in which the court of a neutral may not claim the right of determining whether the capturing vessel be in fact the commissioned cruiser of a belligerent power. Without the exercise of jurisdiction thus far, in all cases, the power of the admiralty would be inadequate to afford protection from piratical capture.

*L'Invincible, supra* at 258.

Thus, admiralty courts have not indulged commissioned vessels any broad jurisdictional exemption from review.

### C.  The Public Vessel Act

Briefly, Congress created the United States Shipping Board in 1916 to revitalize the U.S. merchant fleet in connection with the World War I hostilities. The Shipping Act of 1916, 39 Stat. 728 *et seq*., made United States Shipping Board vessels, which were publically owned merchant vessels, subject to all laws, regulations, and liabilities governing merchant vessels notwithstanding the United States ownership and operation. When this waiver of immunity proved insufficient, Congress expanded Government liability with the Suits in Admiralty Act in 1920, 41 Stat. 525- 26, ("SIAA"), 46 U.S.C. §§ 30901 *et seq*. [prior to recodification, 46 U.S.C. App. §§ 801 *et seq*.] to permit personal actions for damages against the Government in any case where if the Government merchant vessel were privately owned or operated a proceeding in admiralty could be maintained. The SIAA did not waive sovereign immunity for damages caused by a public vessel operating outside the merchant trade such as naval or coast guard vessels.

Congress passed the PVA in 1925, "the last in a series of statutes directed generally at affording private vessel owners an adequate and efficient remedy for damages arising from negligent operation of ships owned by the United States." *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 218 (1945). Operations of U.S. Navy and Coast Guard vessels were the specific object of the waiver of immunity because Government owned merchant vessels were covered by earlier waivers.

> Congress rectified that anomaly in 1925 by passing the Public Vessels Act  … , which authorized *in personam* admiralty actions seeking recovery for "damages caused by a public vessel of the United States." Like the SIAA, the PVA

> contained no exceptions to its waiver of sovereign immunity
> for any particular claims otherwise falling within its scope.

*McMellon v. United States*, *supra* at 335 (citations omitted).

The liberality of the PVA was such that the waiver extended five years retroactively to cover claims that arose in 1920. 43 Stat. 1112. The PVA governed discovery against officers and crews of the public vessels by providing "no officer or member of the crew of any public vessel of the United States may be subpoenaed in connection with any suit authorized under this act without the consent of the secretary" of the department "having control of the vessel at the time the cause of action arose or  …  of the commanding officer of such vessel." 43 Stat. 1112. In 1944 the PVA was amended to provide for stays of proceedings and access to testimony and other evidence during war time. See 58 Stat. 7233 – 726. In 1947 the Navy had over 100 PVA claims pending arising out of the operations of Navy vessels. *Bank Line v. United States,* 163 F.2d 133, 135 n.1 (2nd Cir. 1947).

The Supreme Court has declared that "a narrow interpretation of the [PVA] Act is not justifiable. While the general history of the Act as outlined above does not establish that the statute necessarily extends to the non-collision cases in view of the rule of strict construction of statutory waiver of sovereign immunity, we think Congressional adoption of broad statutory language authorizing suit was deliberate." *Canadian Aviator, supra* at 222 (citations omitted). The PVA "was intended to impose on the United States the same liability (apart from seizure or arrest under a libel *in rem* ) as is imposed by the admiralty law on the private  ship-owner." *Weyerhaeuser S.S. Co. v. United States*, 372 U.S. 597, 600 (1963).

Consistent with the express purpose of the PVA, courts have applied maritime jurisdiction against U. S. Navy and Coast Guard vessels even in war time.  In *United States v.*

*The Australia Star: The Hindoo*, 172 F.2d 472 (2nd Cir.1949), the Second Circuit adjudicated a

1944 war time claim involving a Government cargo vessel under the protection of a Navy escort

operating in a convoy under blackout conditions. The Navy escort vessel and the Government

cargo vessel were held at fault. The Fourth Circuit also took jurisdiction over a wartime collision

between a private vessel and Navy ship operating without lights. *Pacific-Atlantic S.S. Co. v.

United States,* 175 F.2d 632, 641 (4th Cir. 1949). See also, *Bank Line v. United States, supra*; *Ira

S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167, 168-69 (2nd Cir. 1968); *Gibbs v. United

States,* 94 F. Supp. 586 (N.D. Cal. 1950).

### D.  The Scope of the Political Question Doctrine

In *Baker v. Carr*, 369 U.S. 186, 217 (1962), claims presenting a political question were

described as involving:

> a textually demonstrable constitutional commitment of the
> issue to a coordinate political department; or a lack of
> judicially discoverable and manageable standards for
> resolving it; or  the impossibility of deciding without an
> initial policy determination of a kind clearly for non-
> judicial discretion; or the impossibility of a court's
> undertaking independent resolution without expressing lack
> of the respect due coordinate branches of Government; or
> an unusual need for unquestioning adherence to a political
> decision already made; or the potentiality of embarrassment
> from multifarious pronouncements by various departments
> on one question.

"[U]nless one of these formulations is inextricable from the case at bar, there should be no

dismissal for non-justiciability on the ground of a political question's presence." *Id.* at 217. The

Supreme Court has restated that:

> *Baker [v. Carr*] carefully pointed out that not every matter
> touching on politics is a political question, and more
> specifically, that it is "error to suppose that every case

or controversy which touches foreign relations lies beyond judicial cognizance." The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.

*Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 229-230 (1986) (Secretary of

Commerce decision reviewable under the APA notwithstanding the political implications).

## II.     Discussion

There can be no dispute that the Complaint fully satisfies the location and maritime nexus

conditions for maritime tort jurisdiction. The events took place on the high seas and are fully

consistent with well recognized, traditional maritime activities. See *Jerome B. Grubart, Inc. v.*

*Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995).

### A.  Standard of Review as to Motion to Dismiss

In a challenge to subject matter jurisdiction with a Rule 12(b)(1), Fed. R. Civ. P., motion

to dismiss, the district court may regard the pleadings as mere evidence on the issue and may

consider evidence outside the pleadings without converting the proceeding to one for summary

judgment. *Velasco v. Gov't of Indonesia,* 370 F.3d 392, 398 (4th Cir. 2004); *Richmond,*

*Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir 1991). "The

district court should grant the Rule 12(b)(1) motion to dismiss only if the material jurisdictional

facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v.*

*B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999) (citations and quotation marks omitted).

When "jurisdictional facts are inextricably intertwined with those [facts] central to the

merits, the court should resolve the relevant factual disputes only after

appropriate discovery." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

**B.   The Specific Grant of Jurisdiction for "all cases of admiralty and maritime jurisdiction" in the Constitution has been interpreted broadly Without Exclusion for Operations of Naval Vessels Even in War.**

The status of prize vessels was held subject to admiralty jurisdiction notwithstanding the sovereign interests arising out of the U.S. Navy capture of a commissioned ship of a belligerent country during the War of 1812. *L'Invincible, supra;* see also *The S.S. Appam,* 243 U.S. 124, 154 (1917).

In *The Paquete Habana*, *supra*, the Supreme Court reviewed the propriety of the U.S. Naval seizure and sale as war prizes during the Spanish-American war of fishing vessels, called "smacks," operated by foreign belligerents. The Court found the unarmed coastal fishing boats not to be prizes under international law and set aside the seizure. The Court was untroubled by the specific claims of national defense preemption by the Executive including communications between the Navy admiral who captured the smacks and the Secretary of the Navy describing the smacks' crews as "excellent seaman" who have "already served in the Spanish Navy, and who are liable to further service" and, as such, were reserves with "a semi-military character" who should be detained as prisoners of war. *Id.* at 713. In conclusion, the "court, sitting as the highest prize court of the United States, and administering the law of nations" declared that the capture was unlawful. *Id.* at 714. The dissent that "the rule is that exemption from the rigors of war is in the control of the Executive … [and] [h]e is bound by no immutable rule on the subject," *id.* at 720, did not prevail. The Government's position in its Motion is essentially an elaboration of this dissent.

Thus, admiralty courts have not accorded any presumption of non- reviewability even for wartime actions of naval vessels.

### C. The PVA Constitutes an Express Congressional Determination of Manageability of Claims arising out of Damages by U.S. Navy Vessels.

The PVA's text and history of the Congressional intention to permit review and discovery relating to naval damage actions overcomes any presumption against judicial review of naval actions.

The PVA expressly authorizes actions against the Government arising out of the operations of naval vessels without any exceptions for any particular claims. See *McMellon v. United States*, *supra* at 335. The specific regulation of discovery against officers and crews of public vessels in the PVA with consent of the department head or commanding officer, 46 U.S.C.§ 31110, confirms the Congressional intention that the operations of Naval vessels would be subject to judicial scrutiny and, in fact, that evidence would be gleaned from officers and crew, as appropriate. The World War II amendments, 58 Stat. 7233, of this provision to suspend discovery until six months after suspension of the war confirms Congressional recognition of the intention to subject naval operations to PVA jurisdiction even during conflicts.

The PVA, after all, was a post war measure and the major cases applying it are wartime actions. *Canadian Aviator, Ltd. v. United States*, *supra* ( noting the "broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation") sustained a PVA remedy arising out of Navy orders to follow directly astern a Navy patrol boat. There is a long history of claims arising out of operations of military vessels. This Circuit Court took jurisdiction over a PVA claim arising out of a wartime collision between a private vessel and a U.S. battleship zigzagging without lights and the Government responded to interrogatories, provided logs, voyage reports and testimony of witnesses from Naval court of inquiry. *Pacific – Atlantic S.S. Co. v. United States*, *supra,* decision below at 81 F. Supp. 777 (E.D. Va. 1948). Jurisdiction was taken over a claim against the United States arising out of a

15

collision between a privately owned tanker and a U.S. Navy vessel that was operating in a flotilla without lights and extensive evidence was received from the Navy as to the navigation and lighting of the vessels in *United States v. S.S. Washington*, 241 F.2d 819 (4<sup>th</sup>Cir. 1957). See also *Vulcan v. Messiah,* 645 F.3d 249, 261 - 262  (4th Cir. 2011 ) ("while the PVA and SAA establish a broad waiver of sovereign immunity for admiralty-related claims against the United States, this waiver is not without limits" and the doctrine of *Feres v. United States* barring claims by servicemembers is one such limit); *State of Maryland v. United States,* 1947 AMC 1336 (D. Md. 1947) (ordering discovery from Navy witnesses and record keepers in PVA claim arising out of inadvertent torpedoing of oyster boat in Chesapeake).

In *Lind v. United Stat*es, 156 F.2d 231 (2nd Cir. 1946), Judge Hand examined with care the lighting and seamanship that led to a 1944 collision between a fishing vessel and a Liberty ship operating in convoy without lights to escape detection. Judge Hand had no hesitation is assigning fault to the Government vessel whose "inexcusable" fault was "so gross and strange an aberration of seamanship as to warrant no discussion." *Id*. at 232. In *Bank Line Ltd. v. United States, supra*, arising out of a collision between private vessel and Government vessel operating in convoy off Casablanca, the Government's appeal of order to providing testimony of the witnesses taken before the board of inquiry, "testimony which would have to be furnished by the government if it were a private litigant," was denied. The concurring opinion noted "we are dealing with matters of a war now closed, i.e., with matters of history." *Id*. at 139. See also *United States v. The Australian Star*, *supra* at 475 (in 1944 collision in Caribbean between Government vessel under escort and merchant vessel examined the markings and maneuvers of each vessel and assigned Government  vessel part liability concluding Government "explanation [from Master and mate] indicates gross inattention or gross stupidity or both"); *Ocean S.S. Co. v.*

*United States*, 38 F.2d 782, 786 (2nd Cir. 1930)(**"**We have no power to dispense with the [navigation] statute, nor indeed has the Navy. As they [submarines] now sail they are unfortunately a menace to other shipping and to their own crews, as this unhappy collision so tragically illustrates."); *Cheng Sheng Fishery Co. Ltd. v Unites States,* 1996 AMC 1313 (S.D.N.Y. 1996) (examining the approach and maneuvers relating to collision between U.S. Navy tanker and Taiwan registered fishing vessel); *Paterakis v. United States*, 849 F. Supp. 1106 (E.D. VA 1994) (PVA jurisdiction found to a claim arising out of collision between fishing boat with U.S. guided missile cruiser off Crete); *Eustathiou v. United States,* 154 F. Supp. 515 (E.D. VA 1957) (PVA jurisdiction over collision between Greek fishing boat and Navy vessel).

In short, the central premise of the Government Memorandum that the decisions of a U.S. Navy commander are somehow beyond judicial review is contradicted by much directly applicable PVA precedent.

### D.  Application of The Political Question Doctrine Claim is Unsupported

The political question factors can oust a court of jurisdiction only if they are "inextricable" from the case. *Baker v. Carr*, *supra* at 217. The burden is on the party invoking the political question doctrine to demonstrate that at least one of the *Baker* factors is present. *Id*. As the Supreme Court has emphasized, "[t]he doctrine  …  is one of 'political questions,' not one of political 'cases.' … The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." *Id.* at 217.

The grant of jurisdiction in the Constitution for admiralty cases has long been recognized to grant jurisdiction over international maritime claims even for war time decisions. See, e.g.,

*The Paquete Habana*, *supra.* The discussion in the preceding sections demonstrated that Congress and the courts crafted the PVA as a specific commitment to the judiciary of claims relating to operation of Navy and Coast Guard vessels.

None of the cases relied upon in the Government Memorandum from the Fourth Circuit dismiss PVA cases based on the political question doctrine and none support a claim of inextricable political involvement under the PVA. *McMellon v. United States,* though limited to the SIAA, said nothing to support ouster of jurisdiction under to the political question doctrine. *Id.* at 346.

Moreover, nothing in the particular decisions at issue is inextricably intertwined with political decision making within the meaning of *Baker v. Carr.*  The Complaint here challenges the decisions of the on - site commander, not any that can be assigned to the President. Thus, where the challenged decision to initiate an air strike came directly from the President, the dismissal of the claims brought by the pharmaceutical company for the bombing of its Sudanese facility by the U.S. military in *El – Shifa Pharmaceutical Industries Co. v. United States,* 607 F.3d 836 (D.C. Cir. 2010) *(en banc)* is readily distinguishable. The death and injury claims brought by Turkish sailors whose vessel was struck by a missile launched from a Navy vessel during the NATO training exercise were held non-justiciable political questions in *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) cert. denied, 522 U.S. 1045 because claims by military personnel have found little favor as courts are unwilling to risk judgments on military preparedness, assumption of risk and the methods of training for military service members.

In *Tiffany v. United States*, 931 F.3d 271 (4th Cir. 1991), plaintiff's decedent entered into U.S. airspace flying a private aircraft without any approved flight plan and thereby caused air

National Guard planes to scramble to determine the character of the intrusion. In the claim under the Death on the High Seas Act ("DOHSA"), plaintiff alleged that the air collision between her husband's plane and the National Guard jets was negligent in so far as the National Guard had failed to follow applicable procedures. Relying upon the discretionary function doctrine in the FTCA and DOHSA to inform the inquiry, the court held that Tiffany had created the emergency by failing to comply with federal regulations. Rationalizing dismissal of the claim the court explained that "Courts cannot impose their own concept of 'the prudent intercept' on NORAD. Judges have no 'judicially discoverable and manageable standards for resolving' whether necessities of national defense outweigh risks to civilian aircraft." *Id.* at 279 (citations omitted). The court cautioned that "[t]he military does not enjoy a blanket exemption from the need to proceed in a non-negligent manner. When conducting training exercises, for example, or acting in a civilian arena, national defense interests may be more remote and the military faces different restrictions." *Id.* at 280. At bottom the Court was unwilling to let the legitimate alarm in response to an illegal air intrusion become a basis for a tort claim. *Tiffany v. United States* was not a PVA case so it has little application to the Complaint.

In the light of the foregoing, the parade of horribles summoned in the Government Memorandum at 19 *et seq.* to support dismissal based on the political question doctrine are quite unpersuasive.

The Navy's investigation report of the encounter is a public document provided to Plaintiff some time ago and now lodged in the public docket. There is nothing remotely classified in it and it says nothing about anti-pirate strategy except that the Navy commander disregarded his instructions and took little care to  avoid injury to innocent hostages – a policy

that is not the subject of any secrecy or controversy. A full reading of it by media savvy pirates will not endanger future anti-piracy efforts.

Courts have scrutinized the seamanship and maneuvers of U.S Navy vessels   under the PVA for decades demonstrating that there is nothing inherently unmanageable about claims against public vessels. Consequently, the elaborate claim that judicial review of the seamanship and vessel maneuvers by the naval commander would be somehow inappropriate, Government Memorandum at 18 - 20, is manifestly wrong. The ship maneuvers, approach, and decision not to announce the point of fire to hostages, see Government Memorandum at 18, all represent perfectly ordinary decisions of a vessel commander essentially indistinguishable from the decisions reviewed in collision cases.

In addition, the well-developed law governing the liability of marine rescuers, including government vessels, demonstrates the manageability of claims arising out of high seas rescue attempts. A maritime rescuer who does harm may be liable either for negligence that worsens the situation or reckless and wanton conduct. See, e.g., *Furka v. Great Lakes Dredge & Dock Co.,* 755 F.2d 1085, 1088 (4th Cir. 1985)*; Hurd v. United States*, 134 F. Supp. 2d 745 (D.S.C. 2001) aff'd at 34 Fed. Appx. 77 (4th Cir. 2002); *Berg v. Chevron U.S.A., Inc.,* 759 F.2d 1425, 1430 (9th Cir. 1985); *Patentas v. United States,* 687 F.2d 707, 713-14 (3d Cir. 1982); *United States v. DeVane,* 306 F.2d 182 (5th Cir. 1962); *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1021-22 (5th Cir. 1969), cert. dismissed 396 U.S. 1033. The rule applies with equal force to operations of public vessels under the PVA. *Sagan v. United States,* 342 F.3d 493, 498 (6th Cir. 2003); *Wade v. United States*, 2012 U.S. Dist. LEXIS 78743*,* 2012 AMC 1833 (N.D. Cal. 2012). The Complaint may be seen as a species of these cases whose manageability is settled notwithstanding the involvement of public vessels.

The decision to destroy the JCT 68 after all the potential threats had been removed is particularly lacking in support. At that time no pirate threat or other exigency applied so the SWG was operating in a ministerial environment. The JCT 68, which had been tethered to the SWG for a day, retained its Taiwanese identity owing to its registry there and the SWG made no effort to consult with flag or registry authorities for salvors or authority to destroy the boat. The conclusory claim that the sinking of the JCT 68 was made upon order of the NATO commander in compliance with UN resolutions, Government Memorandum at 19, 20, cannot be credited as it contradicts the Complaint at ¶ 24 – 28 and is unsupported with any record reference.[4]  In any event, the U.S. Government chain of command remained in control of the actions of the vessel throughout. Complaint ¶ 11. Review of the authority and rationale for the sinking cannot pose any threat to this post-engagement Navy decision making.

None of the cases relied upon by the Government Memorandum from the Fourth Circuit dismiss PVA cases based on the political question doctrine and none support a claim of inextricable political involvement.  The Government Memorandum is, at best, an argument for creation of a kind of heightened deference to the Navy commander's decision making, a

---

[4] The reference to "United Nations Security Council resolutions in effect at the time", Government Memorandum at 20, is a *post hoc* rationalization. Although the SWG apparently made the decision to destroy the JCT 68 at the direction of the "Commander, CTF 508", there is no indication as to the authority or rationale for the decision. See Government Memorandum, Exhibit E at pgs. 1 and 5. No demonstration of the authority of United Nations *resolutions*, as distinguished from conventions, under U.S. law is attempted, as it would be futile anyway. The United Nations Convention on the High Seas, cited in Government Exhibit C, provides that pirated vessels retain the character of the nation of their registry so the law of Taiwan governed the JCT 68 and the rights of third parties acting in good faith must be honored in proceedings on vessel seizures. See http://untreaty.un.org/ilc/texts/instruments/english/conventions/8_1_1958_high_seas at Art. 18 - 21. No proceedings whatsoever attended the sinking of the JCT 68 and no consultation on Taiwan law or registry took place.

decidedly ahistorical proposition given the PVA precedent set out above and not a basis for dismissal.

### E.   No Showing of Foreign Relations Considerations has been made so as to Make this Case Non-justiciable.

In further support of its claim of political sensitivity, the Government urges, Government Memorandum at 22, that the "potential of embarrassment" makes the case non-justiciable because the court might make pronouncements as to U.S. and NATO decisions concerning suppression of piracy citing *Baker v. Carr* factors five and six as well as *Aktepe v. United States*, *supra*. According to the Government, scrutinizing NATO military operations in the tort context could cause international embarrassment and undermine U.S. foreign relations.

The fact that the President of the United States and an element of the United Nations may have spoken to an issue cannot make it unduly political and, therefore, beyond the scope of judicial review. After all, in this day the President and the United Nations espouse views on a broad range of matters, great and small, from the mundane to the global. There is scarcely a subject upon which the President not opined. The mere presence of some presidential opinion or condemnation does not make a matter so political as to be beyond the scope of the judicial jurisdiction. A Presidential finding that piracy should be combated does not make this age-old scourge political. These proclamations did not interfere with the prosecution of pirates apprehended in the Indian Ocean. See *United States v. Dire*, 680 F.3d 446 (4th Cir. 2012). Statements of  the President or other  Executive officer, Government Memorandum at 22, 23, cannot oust a court of jurisdiction as any challenge to virtually any agency decisions would be made unreviewable.

In short, the Government has made no showing of the requisite "discriminating inquiry into the precise facts and posture of the particular case," *Baker v. Carr, supra* at 217, to show potential foreign affairs entanglement or embarrassment. Nothing in the Complaint resists the effort to combat pirates, in general, which is the essence of the Presidential statements cited by the Government. There is no suggestion that the President had any involvement with the strategy or the orders in the particular case of the JCT 68 so no opportunity for embarrassment would be manifest in review of the conduct of the police action of May 10, 2011. The Complaint challenges the specific actions of the SWG, and its disregard of the safety of the innocent hostages and the rules intended to reinforce that concern. Support for law enforcement, in general, is not without limits; so a court may review specific enforcement actions for undue disregard of rules and law without threatening the general policy. [5]

**Conclusion**

The development of the PVA and the long history of judicial decisions implementing it together with the Constitutional grant of admiralty jurisdiction to the district courts, which the Government has utterly failed to address, preclude grant of the Government Motion. *McMellon v. United States, supra,* implicitly rejected the political question doctrine advanced by the Government by taking jurisdiction over a similar issue under the SIAA.

---

[5] *Smith v. Reagan*, 844 F.2d 195 (4th Cir. 1988) is unavailing to the Government argument as it sought judicial enforcement of an act of Congress expressing hortatory, generic support for American hostages in Vietnam and Cambodia without granting any specific rights or remedies. The PVA, of course, is remedial in nature.

The Government Motion must be denied.

Respectfully submitted,


/s/


Timothy B. Shea
Nemirow Hu & Shea
1900 L Street, NW; #303
Washington, DC  20036
Tel.(202) 835-0300
Fax (888) 522 4519
Email  timbshea@aol.com




Certificate of Service


I hereby certify that I have served the foregoing Opposition on attorneys for the United States by ecf this 23 rd day of August, 2013.



/s/

Timothy B. Shea