In the

United States District Court
for the District of Maryland

| | | |
|---|---|---|
| Wu Tien Li-Shou,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil Action No. 1:13 cv 01366 JFM |
| United States of America,<br>    Defendant. | )<br>)<br>) | |

**Appendix of Cases not Generally Reported**

*Cheng Sheng Fishery Co. Ltd. v Unites States,* 1996 AMC 1313 (S.D.N.Y. 1996)

*State of Maryland v. United States,* 1947 AMC 1336 (D. Md. 1947)

Copyright © 1947 American Maritime Cases, Inc.

Page 1



Copyright © 1947 American Maritime Cases, Inc.

STATE OF MARYLAND, FOR THE USE OF DAISY KENT, WIDOW OF HARRISON KENT, DECEASED; ET AL., Libellants, vs. UNITED STATES OF AMERICA, Respondent. (FOUR CASES.)

In Admiralty - No. 2894

UNITED STATES DISTRICT COURT, DISTRICT OF MARYLAND

*1947 AMC 1336*

June 18, 1947

**HEADNOTES:**

PRACTICE - 196. Discovery - SUITS IN ADMIRALTY ACT - (Public Vessels Act) - 18. Practice - UNITED STATES - 12. Consent to be Sued - Federal Tort Claims Act.

On motion of Libellants in a suit under the Public Vessels Act and the Federal Tort Claims Act for damages for the death of oystermen killed or drowned when a U.S. Navy Torpedo struck and sank their boat, the Court directed the production of copies of reports made by those aboard the torpedoing vessel, disclosure of names and addresses of Navy personnel and witnesses who testified before the Navy Board of Investigation, and the production of copies of reports and photographs of the salvage operation, etc., except "anything of a confidential nature from a national defense standpoint."

**COUNSEL:**

NILES, BARTON, MORROW & YOST and LOUIS L. GOLDSTEIN (STUART E. BROWN, JR., Advocate), Proctors for Libellants.

BERNARD J. FLYNN, U.S. Atty. and C. ROSS McKENRICK, Asst. U.S. Atty. (JOHN T. CASEY, Atty., Dept. of Justice, Advocate), Proctors for U.S.

**OPINION:**

STATEMENT. *

* Prepared by Stuart E. Brown, Jr.

On January 10, 1946, an oysterboat operated in the Patuxent River, in the vicinity of Solomons, Calvert County, Maryland, was struck by a United States Navy torpedo and, as a result, the two oystermen aboard were killed or drowned. Libels *in personam* were filed against the U.S.A. under the Public Vessels Act and under the Federal Tort Claims Act, on behalf of the widows of the deceased oystermen and on behalf of their personal representatives.

Following the accident a Board of Investigation was held by the Navy at the U.S. Navy Mine Warfare Test Station, Solomons, Maryland, and the libellants moved for an order requiring the respondent, in accordance with Rule 32 of the General Admiralty Rules, to produce and permit libellants to inspect and copy all of the records, stenographic transcripts, exhibits (including statements, graphs, photographs, reports, etc.), tangible evidence of all kinds, findings, etc., of and used at the Board of Investigation.

Copyright © 1947 American Maritime Cases, Inc.

A hearing on the motion was had before the Honorable WILLIAM C. COLEMAN, who rendered an oral opinion, and on July 9th, signed an order pursuant to his oral opinion.

MOTION.

Libellants respectfully move this Honorable Court for an Order requiring respondent:

1. To produce, and to permit libellants to inspect and to copy, each and all of the following documents:

(a) All of the records, stenographic transcripts, exhibits (including statements, graphs, photographs, reports, etc.), tangible evidence of all kinds, findings, etc. of and used at any and all Courts of Inquiry, Boards of Investigation, Deck Courts, Summary Courts Martial, General Courts Martial and/or other formal hearings or inquiries held by agents and employees of the United States Navy at the United States Naval Mine Warfare Test Station, Solomons, Maryland, following and arising out of the deaths of Harrison Kent and Oscar Martin on January 10, 1946.

The respondent, by its agents and employees, the Commanding Officer, United States Naval Mine Warfare Test Station, Solomons, Maryland, the Secretary of the Navy, the Judge Advocate General of the Navy, and/or their attorneys, have in their possession, custody and control all of the foregoing documents. All of the said documents constitute and contain evidence relevant and material to the questions involved in this action, as is more fully shown in Exhibit "A" hereto attached.

ORDER OF COURT.

On June 18, 1947, there came on for hearing the libellants' Motion filed herein for production of documents and Messrs, Niles, Barton, Morrow & Yost and Louis Goldstein, Esq., by Stuart E. Brown, Jr., of counsel, having appeared in support of said Motion and Bernard J. Flynn, Esq., United States Attorney, by Carl Ross McKenrick, Esq., Assistant United States Attorney, and John T. Casey, Attorney, Admiralty Division, Department of Justice, having appeared in opposition thereto.

And the Court being of the opinion that the said libellants are entitled to:

(a) Copies of any reports made by the Commanding Officer, Officer-in-Charge, or any personnel on board the *YC-758* at the time of the torpedoing on January 10, 1946, of the oyster boat manned by Oscar Martin and Harrison Kent, if such reports relate to the said torpedoing;

(b) Names and addresses, if known, of all personnel aboard the *YC-758* at the time of the said torpedoing, and the names and addresses, if known, of all persons called to testify as witnesses at the Navy Board of Investigation hearing held concerning the said torpedoing;

(c) Copies of any reports made of diving operations on, and the salvaging of, the said oyster boat, including any photographs taken of the oyster boat after it was salvaged;

And the Court doth ORDER, this 9th day of July, 1947, that said copies and information be furnished the libellants within twenty (20) days from the entry of this Order.

Notwithstanding the generality of the foregoing, the respondent may omit from such copies and photographs anything of a confidential nature from a national defense standpoint;

And the Court doth FURTHER ORDER that libellants' Motion for the production of the record and findings of the Navy Board of Investigation be and the same is hereby denied, with the exception of the particular items of said record as are enumerated under paragraphs (a), (b) and (c) of this Order.



1 of 2 DOCUMENTS

Copyright © 1996 American Maritime Cases, Inc.

CHING SHENG FISHERY CO., LTD. v. UNITED STATES OF AMERICA

93 Civ. 1634

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK

*1996 AMC 1313*

April 5, 1996

**HEADNOTES:**

   **SUITS IN ADMIRALTY ACT AND PUBLIC VESSELS ACT -- 123. Foreign Citizen or Corporation.**

   Chapter VI of the Maritime Law of the Republic of China meets the reciprocity requirement of the Public Vessels Act and permits a collision suit by a Taiwanese shipowner.

   **COLLISION -- 13112. Radar Plotting -- 1313. Action to Avoid Collisions (Rule 8) -- 13411. Maneuvering Signals under COLREGS (Rule 34) -- 1442. Safe Speed in Clear Weather.**

   U.S. Navy vessel's speed of 18 knots before collision avoidance maneuvers at night in clear weather in traffic in Malacca Strait did not violate Rule 6; her radar observation and plotting conformed to Rule 7 and her collision with a Chinese fishing vessel was caused solely by the latter's inattention and late, inept maneuvers, while her own changes of speed and of course, one way and then the other, were not violations of Rule 8 but reasonable responses to the unpredictable and inappropriate actions of the fishing vessel in the presence of other vessels, and her violations of Rule 34 in failing to sound signals upon hard right rudder and emergency full astern orders are excused because of evidence that they would have served no purpose.

   **EVIDENCE -- 1110. Hearsay -- 119. Federal Rules of Evidence -- Rule 803(8)(c) -- 136. Public Documents -- 22. Agency Findings and Conclusions.**

   In a case of collision of a U.S. Navy vessel, the report of the Navy's Judge Advocate General, including opinions, is entirely admissible in evidence pursuant to Rule 803(8)(c) since *Beech Aircraft Corp. v. Rainey* does not distinguish between fact and opinion in reports.

   **EVIDENCE -- 1110. Hearsay -- 119. Federal Rules of Evidence -- Rule 801(d)(2).**

   In a collision action, "Notes of Evidence" prepared by an English solicitor based on interviews with unavailable crew members as part of his investigation are admissible under Rule 801(d)(2).

**COUNSEL:**

   William F. Dougherty (Burke & Parsons) for Ching Sheng Fishery

   Arthur J. Gribbin, Frank W. Hunger, Asst. Atty. Gen., Mary Jo White, U.S. Atty., Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civ.Div., Dept. of Justice for U.S.

**OPINIONBY:** SCHWARTZ

**OPINION:**

   [*1314] ALLEN G. SCHWARTZ, D.J.:

This action arises from a collision on the high seas between plaintiff's Taiwanese-flag commercial fishing vessel, the *Hui Kuo No. 16*, and the USNS *Ponchatoula*, a civilian-crewed United States Navy oiler operated by the Navy's Military Sealift Command. The Court tried this action upon the written submissions of the parties pursuant to a stipulation dated November 8, 1994. Jurisdiction is based on the Public Vessels Act, *46 U.S.C. app. §§ 781*-90, and Rule 9(h) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court finds in favor of the defendant.

**Background**

The sole liability issue before the Court is a determination of what degree of fault, if any, should be assigned to defendant. Plaintiff contends that the parties share blame for the collision but that the far greater share of fault should be borne by defendant. Defendant submits that the sole cause of the collision was the negligence and statutory violations of plaintiff, without any negligence on the part of defendant contributing thereto.

**Undisputed Facts**

The following facts are not in dispute. The *Ponchatoula* (the *Ponchatoula*) is a United States Naval Ship owned by defendant and operated by the United States Navy Military Sealift Command as a civilianmanned fleet replenishment ship. The *Ponchatoula* is 655 feet in length, 86 feet in width, displaces 26,840 tons when fully loaded, and carries 128 personnel when fully manned. The crew of the *Ponchatoula* at the time of the collision consisted of the Master, 98 crewmembers, and a military detachment of 21 United States Navy uniformed personnel.

The *Hui Kuo No. 16* is a fishing vessel owned by plaintiff Ching Sheng Fishery Company Limited. Her Port of Registry is Kaoshiung, [*1315] Republic of China (Taiwan). Plaintiff is a privately held corporation organized and existing under the laws of the Republic of China. *Hui Kuo No. 16* measures approximately 161 feet in length and 26 feet in width. The crew of *Hui Kuo No. 16* at the time of the collision consisted of the Master and 31 crewmembers.

At the time of the collision, the *Ponchatoula* was equipped with two separate radar units, a Raytheon three-centimeter radar and a Raytheon ten-centimeter radar. Both radars could be monitored from separate radar repeaters located on the bridge. A Raytheon Collision Avoidance System ("RAYCAS") was connected to the *Ponchatoula*'s ten-centimeter radar repeater. RAYCAS is a computer system which gives the course and speed of designated radar contacts and also provides the time, bearing and range of the contact's closest point of approach ("CPA"). Only one contact may be so designated at any one time on the RAYCAS.

The *Hui Kuo No. 16* was equipped with one Furuno radar unit and a Tokyo Keiki (PR 2000) New Resco automatic pilot unit. It is not known whether the *Hui Kuo No. 16* was equipped with a collision avoidance system.

At approximately 7:40 a.m. on March 22, 1991, the *Hui Kuo No. 16*, under Captain Shaw Tzyh Ran ("Captain Shaw"), n1 departed Singapore, bound for the Indian Ocean, via the Malacca Strait, for an extended fishing voyage. Through the Malacca Strait, the *Hui Kuo No. 16* was heading in a generally northwesterly direction. At 12:01 a.m. on March 23, 1991, the *Ponchatoula* was approaching the western Malacca Strait, heading in a generally southeasterly direction, en route to Phattaya Beach, Thailand, following the completion of a deployment to the Persian Gulf in support of Operation Desert Storm.

n1 Captain Shaw is also referred to as Captain Shou Shi Ran or Captain Shou.

The *Ponchatoula*'s Second Officer Stephen Gioulis ("Gioulis") reported to the bridge at 3:40 a.m. on March 23, 1991 and at 4:00 a.m. officially assumed the 4:00 to 8:00 bridge watch, after being briefed by Third Officer Cleveland James. Gioulis noted that the *Ponchatoula*'s speed was 18.1 knots and that she was on a course of 140 degrees. The weather conditions observed by Gioulis when he assumed the bridge watch were light seas, good visibility, and clear skies, with a wind of approximately seven knots. Sunrise would occur at 6:15 a.m.

Gioulis plotted the *Ponchatoula*'s position at 3:58 a.m., by taking a radar range and bearing of an island she had passed, and ordered the [*1316] helmsman to change the vessel's course to 134 degrees. After 4:30 a.m. Gioulis began tracking on the three-centimeter radar three vessels (contacts), which were one to two points (i.e. 11.25 to 22.5 degrees) off the *Ponchatoula*'s port bow. After acquiring the vessels on radar, Gioulis was able to locate them visually using binoculars and determine that each vessel was showing a single red (port) side light. After making his initial observation of the three vessels and plotting their positions on the three-centimeter radar over a period of about six minutes, Gioulis determined that the closest contact would pass ahead of the *Ponchatoula*, crossing her bow. The other two vessels

would pass down the *Ponchatoula*'s port side. At this time, the three vessels were greater than ten miles ahead of the *Ponchatoula*.

At about 4:40 a.m. the closest vessel turned left, changing from a red (port) side light to a green (starboard) side light, and started to move slowly across the *Ponchatoula*'s bow from port to starboard. Several minutes later, with the use of the vessel's alidade (a telescope mounted over a compass repeater for measuring direction), three vertical red lights, in addition to the green side light, were observed on the closest vessel -- indicating that she was a vessel constrained by her draft as defined by the International Rules of the Nautical Road. Once the closest contact, which was displaying three vertical red lights, had steadied on her new course and was "fine" (i.e. within five degrees of the *Ponchatoula*'s bow) on the *Ponchatoula*'s starboard bow, Gioulis ordered the helmsman to come left to a course of 125 degrees, to give the vessel displaying three vertical red lights more room to pass down the *Ponchatoula*'s starboard side. This occurred at approximately 5:00 a.m. Before altering the *Ponchatoula*'s course to the left, Gioulis ascertained that the two other contacts ahead were still bearing one to two points off the *Ponchatoula*'s port bow, at a range of seven to eight miles, and were still displaying red (port) side lights.

The helmsman actually swung past the ordered course of 125 degrees to 122 degrees, so Gioulis ordered the helmsman to steady on course at 122 degrees. Shortly after the *Ponchatoula*'s course alteration, the vessel displaying three vertical lights altered her course to starboard to effect a starboard-to-starboard passage with the *Ponchatoula*, and to pass between the *Ponchatoula* and a fourth vessel that was proceeding in the same direction as the *Ponchatoula*, seven to eight miles off of the *Ponchatoula*'s starboard bow. Gioulis determined that the vessel displaying three vertical red lights (later determined by Gioulis to be a large tanker) would pass the *Ponchatoula* with a CPA of 1.7 miles.

[*1317] After the *Ponchatoula*'s course change, the other two vessels, which Gioulis had been tracking since 4:30 a.m., were fine on the *Ponchatoula*'s port bow, both showing red side lights at a distance of approximately five nautical miles ahead of the *Ponchatoula*. From his visual observation of these contacts, Gioulis had the impression that they were dead in the water or moving very slowly.

At approximately 5:00 a.m., as Gioulis was effecting the *Ponchatoula*'s change in course, the vessel's master, Captain Peter Brent ("Captain Brent"), arrived on the bridge. Captain Brent had not been called by Gioulis, but he decided to check on the traffic situation. The Captain's orders for that night directed that he be called once the *Ponchatoula* approached to within three hours of a point of reference known as the One Fathom Bank. When Captain Brent arrived on the bridge, the *Ponchatoula* was proceeding at 18 knots and, at that speed, would have reached the One Fathom Bank in approximately two hours and 15 minutes. Shortly after arriving on the bridge, Captain Brent checked the radar and noted the contacts on the *Ponchatoula*'s starboard side.

The Captain's standing orders to his bridge watchstanders required that they maintain a minimum three-mile CPA for other ships and a one-mile CPA for coasters and fishing boats. The watchstanders were free to maneuver early to maintain these CPAs. If the watchstander was unable to maintain these CPAs or believed that a situation posed a danger, he was required to call the Captain 15 minutes prior to arriving within three nautical miles ("NM") of another ship or one NM of a coaster or fishing boat.

Captain Brent designated the closest contact, the vessel displaying three vertical red lights on the RAYCAS, and determined that her CPA would be 1.6 NM. The Captain checked the navigation chart then in use and noticed there had not been a navigational fix since 4:13 a.m. Captain Brent went out on the starboard bridge wing to take visual bearings on the large tanker as she passed down the *Ponchatoula*'s starboard side and noticed two more distant contacts ahead which were both showing red side lights. The Captain took visual bearings on the two contacts for about three minutes and determined that the closer of the two, which was also the furthest to the right and now showing both green and red side lights, was also going to pass down the *Ponchatoula*'s starboard side.

When the Captain asked Gioulis about the two contacts, Gioulis said that he was aware of the contacts and that the contact furthest to the right was displaying three vertical red lights (a second tanker) [*1318] indicating her movements were constrained by her draft. Captain Brent asked Gioulis for his proposed course of action, and Gioulis stated that he intended to come left a few more degrees to open up the CPA of the first tanker and then come right, back to the original course of 134 degrees. When the Captain asked Gioulis where the *Ponchatoula* was, Gioulis replied that he was not sure since they had not had a satellite fix in a long time.

At approximately 5:15 a.m., Captain Brent directed Gioulis to obtain a fix on *Ponchatoula*'s position and relieved him of the "conn" of *Ponchatoula* because he did not want him trying to get a fix and monitoring the radar contacts at

the same time. At this time, the vessel ahead displaying three vertical red lights was shown on radar to be three and a half miles away.

At approximately 5:17 a.m., Captain Brent ordered the *Ponchatoula*'s speed reduced from 115 RPM to 60 RPM. n2 The Captain estimated that it could take up to ten minutes to effect such a reduction in speed. Captain Brent took visual bearings on the two vessels ahead of the *Ponchatoula* and determined that the vessel with three vertical red lights (the second tanker) would pass close down the *Ponchatoula*'s starboard side, but he was more concerned about the other vessel (the *Hui Kuo No. 16*), which was maintaining a constant bearing of about ten degrees off the *Ponchatoula*'s starboard bow and still showing a red (port) side light.

> n2 115 RPM is equivalent to approximately 18 knots; 60 RPM is equivalent to approximately 10 knots.

Captain Brent considered a turn to port, which was clear of traffic, since he was restricted from turning to starboard because the second tanker was now close to passing down *Ponchatoula*'s starboard side. At this point in time, the Captain used the ten-centimeter radar to determine that *Hui Kuo No. 16* was at a range of about 2.5 NM. Approximately 30 seconds to two minutes after he ordered a reduction in RPM from 115 to 60, Captain Brent noted that the *Hui Kuo No. 16* was now showing both red (port) and green (starboard) side lights. At this time, the Captain estimated that the *Hui Kuo No. 16* was less than two miles away from the *Ponchatoula*, bearing 005 degrees off *Ponchatoula*'s starboard bow.

Captain Brent now decided to turn to port, but before he could order a port turn, the *Hui Kuo No. 16* again began showing only a red (port) side light. At approximately 5:21 a.m., Captain Brent ordered [*1319] the engine room to stand by the engines. At approximately 5:22 a.m., after determining that the second tanker was now abaft the *Ponchatoula*'s beam to starboard, Captain Brent ordered the helmsman to put the vessel's rudder over hard right and directed the engine room to stop the engines. As the *Ponchatoula* began to swing to starboard, approximately 30 seconds later, the Captain ordered the engines "emergency back full."

From the starboard bridge wing, Gioulis informed Captain Brent that the *Ponchatoula* could not go right without hitting the second tanker. The Captain ordered his rudder shifted to hard left in order to stop the *Ponchatoula*'s starboard swing and took a visual bearing on the tanker. After confirming that the *Ponchatoula* was not restricted by the tanker, Captain Brent again ordered his rudder shifted back to hard right. There was approximately one mile between the *Hui Kuo No. 16* and the *Ponchatoula* at this time.

The *Ponchatoula*'s starboard turn was slowed but not stopped by Captain Brent's momentary shift to left hard rudder. After the *Ponchatoula* shifted her rudder back to hard right, the *Hui Kuo No. 16* commenced a port turn and was now showing only a green (starboard) side light. The *Ponchatoula* continued her turn hard right, with her engines full astern, until the point of collision. At approximately 5:25 a.m., Captain Brent sounded the emergency signal on the *Ponchatoula*'s whistle and then sounded it again approximately one minute later. The *Hui Kuo No. 16* did not alter her course as a result of the emergency signal and continued her port turn until the point of collision. When Gioulis heard the *Ponchatoula*'s whistle sounding the danger signal, he sounded the vessel's collision alarm. As the *Ponchatoula* swung right to a course heading of about 250 degrees, she collided with the *Hui Kuo No. 16*.

The time of the collision was approximately 5:27 or 5:28 a.m. (6:27 or 6:28 a.m. Singapore time). The position of the vessels at the time of the collision was about three degrees 14 minutes north latitude and 100 degrees 32 minutes east longitude. The *Ponchatoula* had astern thrust (minus 30 RPMs) at the time the collision alarm was sounded. The *Hui Kuo No. 16* increased speed shortly before the collision. The *Hui Kuo No. 16* was not restricted by traffic or shallow water from making a starboard turn to avoid the collision, and she never sounded the danger signal. Neither vessel attempted to contact the other by bridge-to-bridge VHF radio.

[*1320] In an Accident Report submitted to the Fisheries Representative of the Counsel of Agriculture of the Republic of China, dated March 1991 and signed by the Master of the *Hui Kuo No. 16*, Captain Shaw, and six other crew members, Captain Shaw stated that at 6:05 (Singapore time) he saw the middle masthead light of a vessel in front of the *Hui Kuo No. 16*'s starboard bow. He stated that he asked the two deckhands on watch to pay attention to this vessel as he had to go to the stern to have a look because there was another vessel approaching the *Hui Kuo No. 16* from her port stern. Afterwards Captain Shaw entered the cabin to use the toilet. He stated that at 6:16 a.m. he was walking back to the bridge when Deckhand Xu Xin Bin rushed out of the bridge to call him as the vessel in front of the *Hui Kuo No. 16* was approaching. Upon Captain Shaw's return to the bridge, he saw the white light and green light of the approaching vessel. He stated that he immediately turned the wheel four to five degrees to port. Captain Shaw stated that at approxi-

mately 6:19 a.m., when he realized that a collision was unavoidable, he stopped the main engine. The Captain stated that the collision occurred at 6:20 a.m. Singapore time (5:20 a.m. *Ponchatoula* time).

In a Casualty Report submitted to the Kaohsiung Harbor Bureau, dated May 6, 1991, signed by Captain Shaw, the Chief Engineer, and the Chief Officer of the *Hui Kuo No. 16*, the Captain stated that at 6:00 a.m. he and two deckhands were on the bridge. The main engine on the bridge was on bridge remote control, and the course was steered by the auto pilot. Captain Shaw stated that at 6:05 a.m. he saw a white light appearing on the bow and an overtaking white light was sighted on *Hui Kuo No. 16*'s port quarter. The Captain suddenly felt an acute stomach pain and rushed to the toilet, reminding the deckhands to pay particular attention to the vessel on the bow. Captain Shaw stated that at 6:16 a.m. he was on the way back to the bridge when a deckhand rushed out of the bridge door to tell him that a vessel was approaching very fast. He stated that when he took over control of the steering and the main engine on the bridge, he realized that he was already too close. He took immediate action by coming hard port but this was fruitless.

There were no injuries to the crews of either the *Ponchatoula* or the *Hui Kuo No. 16* as a result of the collision. The parties agree that the International Regulations for Preventing Collisions at Sea, *33 U.S.C. § 1602 et seq.*, as amended (the "COLREGs"), were the rules to be [*1321] adhered to by both vessels in the instant action. Plaintiff's total damages resulting from the collision are $ 1,200,000.

**Findings of Fact**

In addition to these undisputed facts, the Court makes the following findings. Captain Brent testified at his deposition n3 that as the *Ponchatoula*'s speed was being reduced from 115 RPM to 60 RPM, he noted that the *Hui Kuo No. 16* was approximately 10 degrees starboard relative to the *Ponchatoula*. The Captain checked the radar and determined that the *Hui Kuo No. 16* was located in a range of approximately two and one half miles and was showing a red (port) side light. At this point, Captain Brent stated that,

> I remember sitting there trying to decide what to do. I had a contact that appeared to be crossing my bow at a very close angle, effectively an angle. . . . The best solution would have been of course to come right and pass under his stern. However, I couldn't do that. By this time, B [the second tanker] . . . was getting fairly close to going down my side. That would have put my ship in serious jeopardy to go right.
>
> So my option then would be to come left which is not a very good option, or to slow, and while I'm trying to decide what to do here, he turned -- or at least he gave me a different aspect. I can't speak for exactly what he did, but all of a sudden, instead of having a red with a white on top, I got two side lights, red and green with white on top.
>
> My assumption was that he had come left to pass down behind the larger ship and pass clear on me to starboard. It was like he was going to be very close. My plan was to come to port, just to give these guys more room. We were getting pretty crowded, over 1.6, on mile CPA, is a little close for ships.
>
> Before I had a chance to do that, I lost his green light. I went back to the single red light with a white light on top.

Captain Brent realized that "coming left was not an option," because the *Hui Kuo No. 16* appeared to be turning right, n4 and that the *Ponchatoula* [*1322] could not go right because the second tanker was passing on her starboard side. Consequently, the Captain proceeded to "stop the ship . . . as quickly as possible." The Captain ordered the crew to "standby engines", then 10 to 15 seconds later, when he received word that the engine room crew was standing by, to execute an "all stop." Not more than a minute and a half later, the Captain ordered an "emergency back full," which puts the engines in reverse. The *Ponchatoula*'s engines could not be put in reverse immediately, eliminating these intermediary steps, without doing damage to them.

> n3 The Court admits into evidence the deposition testimony of both Captain Brent and Second Mate Gioulis.

> n4 Captain Brent also stated that turning left was not a good option because (1) under the COLREGs, vessels in a head-on situation are required to turn right except in extreme circumstances and (2) he was not sure where the *Ponchatoula* was at the time, and he knew that there was shoal water somewhere off the ship's port side.

Captain Brent assumed that the *Hui Kuo No. 16* was turning right because she went from showing a green side light to showing a red side light. At the same time, the second tanker was passing the *Ponchatoula* on her starboard side. Captain Brent ordered a "right full or right hard rudder" in order to avoid the *Hui Kuo No. 16*, but almost immediately the second mate alerted him that the ship would hit the tanker passing on the starboard side. Captain Brent ordered the helmsman to shift the rudder, but then looked out and realized that the *Ponchatoula* was not in real danger of hitting the second tanker, so he ordered a shift back to right full. The Captain testified that the rudder never had a chance to get from right full to left full when he ordered the shift; rather, it "probably never got more than midship" before it went right again.

After the *Ponchatoula*'s rudder was shifted back to full right, the *Hui Kuo No. 16* turned left, once again showing a green (starboard) light. At this point, the Captain believed that the *Hui Kuo No. 16* was going to try to cross the bow of the *Ponchatoula*, even though the *Ponchatoula* was making a hard right turn. Captain Brent sounded six short blows on the whistle, and within one minute, again sounded six short blows. He stated,

> At this point, there is nothing for me to do. I have got my engines going full stern. I have got a hard right rudder on. I'm trying to run away from this guy. He is continuing, as it appeared to me, to chase me. He actually keeps coming left and is hitting right into my bow. And as we are turning, he is coming down like this and he makes a left turn and just comes into my bow. He chased me right down and ran into -- came in from the left side, my port side, and it was like he was trying to cross my bow. . . . When we actually [*1323] hit him, he was coming in more at an angle, perhaps 20 degrees aft of my port bow. . . .

The Captain summarized the situation as follows: "We had the collision because the *Hui Kuo 16* came left at the end instead of continuing on her course. If she had not come left and put herself in jeopardy with me, actually turned into my bow when in a close quarter situation, we would not have had the collision."

Captain Brent's testimony is not contradicted by the Judge Advocate General Report ("JAG Report") of the Department of the Navy, submitted by plaintiff. n5 The JAG Report is based on documents such as the *Ponchatoula*'s logs, Captain Brent's standing orders, damage reports on the *Hui Kuo No. 16* and interviews with Captain Brent, Second Mate Gioulis, Ordinary Seaman Henry Nivera, Able-Bodied Seaman Christopher Jenkins, Second Assistant Engineer Johnny Robinson, YN1 Edward Stallworth, OSC Dewey Hodge, and First Officer Gerald Hickey of the *Ponchatoula*, and Captain Shaw of the *Hui Kuo No. 16*.

> n5 The JAG Report is admitted into evidence in its entirety (including its "opinions"), over the objection of defendant, pursuant to Federal Rule of Evidence 803(8)(c). See *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 164, 1989 AMC 441, 449 (1988) (the rule does not create a distinction between "fact" and "opinion" contained in reports).

The JAG Report includes, *inter alia*, the following findings, which the Court adopts herein:

> 33. At approximately 0517 Captain Brent reduced the *Ponchatoula*'s speed from 115 RPMs to 60 RPMs (18 to about 10 knots). . . .

> 36. At this point in time the *Hui Kou* [sic] was about 10 degrees (relative to the *Ponchatoula*) on the starboard bow at a distance of 2.5 nautical miles.

> 37. Captain Brent then noted the *Hui Kou* [sic] was turning to port and now showed both port (red) and starboard (green) running lights.

38. Before he could order a port turn Captain Brent noted the *Hui Kou* [sic] had swung back to starboard and was showing a port (red) running light.

39. At approximately 0521 Captain Brent informed the engine room to stand by engines.

[*1324] 40. At approximately 0522, after determining the second tanker with 3 red lights was now abaft the *Ponchatoula*'s beam to starboard, Captain Brent ordered the helmsman right hard rudder and the engine room to stop engines.

41. Approximately one-half minute later, as the *Ponchatoula* began to swing to starboard, Captain Brent ordered the engines full astern.

42. From the starboard bridge wing, Second Officer Gioulis informed the Captain that the *Ponchatoula* could not go right without hitting the tanker.

43. Captain Brent ordered shift your rudder (hard left) in order to stop the *Ponchatoula*'s starboard swing, and took a visual bearing on the tanker.

44. After confirming the *Ponchatoula* was not restricted by the tanker, Captain Brent again ordered shift your rudder (hard right) to the helmsman. . . .

45. The *Ponchatoula*'s starboard turn was slowed but not stopped by Captain Brent's momentary shift to left hard rudder.

46. At approximately 0524, the *Hui Kou* [sic] commenced a port turn.

47. Captain Brent then again looked at the *Hui Kou* [sic] and saw a starboard running light and a target angle of about 060 degrees.

48. The *Ponchatoula* continued its turn hard right (which she held until the point of collision).

49. At approximately 0525, Captain Brent sounded the emergency signal on the ship's whistle.

50. The F/V *Hui Kou* [sic] *No. 16* did not alter her course as a result of the emergency signal.

51. At approximately 0527, seeing a collision was imminent, Second Officer Gioulis sounded the collision alarm.

52. As the *Ponchatoula* swung to a course heading of about 250 degrees, she collided with the *Hui Dou* [sic]. . . .

56. Captain Brent noted the Doppler speed log indicated 6-8 knots at the time of the collision.

[*1325] 57. The *Ponchatoula* had astern thrust (minus 30 RPMs) at the time the collision alarm was sounded and was almost stopped. . . .

59. The F/V *Hui Kou* [sic] *No. 16* was travelling at 10 knots until shortly before the collision.

60. The F/V *Hui Kou* [sic] *No. 16* increased speed just prior to the collision with the *Ponchatoula*.

61. The F/V *Hui Kou* [sic] was not restricted by traffic or shallows from making a starboard turn to avoid the collision. . . .

65. In his first interview, the Master of the *Hui Kou* [sic], Captain Shou Shi Ran, stated he ordered his helmsman to steer hard right to avoid the collision.

66. In his second interview, Captain Shou Shi Ran stated he turned the *Hui Kou* [sic] to port to avoid the collision because the *Ponchatoula* was showing a green (starboard) running light. . . .

71. There is evidence that Captain Shou Shi Ran was not on the bridge at the time of the collision.

The Court finds that Captain Shaw's statements contained in the JAG Report lack credibility because he gave two conflicting versions of the events leading up to the collision during his two interviews with the JAG investigators. On March 25, 1991, Captain Shaw claimed that when a deckhand informed him that the *Hui Kuo No. 16* was on a collision course with a large vessel, he directed the helmsman to steer hard right to avoid the oncoming vessel. Captain Shaw also stated that the *Ponchatoula* maintained a constant bearing and speed and did not deviate from the collision course. On March 26, 1991, Captain Shaw was interviewed a second time. This time, Captain Shaw told the interviewers that before the collision the *Ponchatoula* slowed down but maintained a steady course. Captain Shaw also stated that three minutes before the collision he attempted to avoid the *Ponchatoula* by turning to port and increasing his speed. He claimed that he turned to port because he saw a green (starboard) running light on the *Ponchatoula*. The fact that Captain Shaw gave two entirely different accounts of these events damages his credibility and casts doubt as to whether he was actually on the bridge at the time of the collision, or shortly prior thereto.

The JAG Report also contains the statement of Ordinary Seaman Henry Nivera. Nivera stated that right before the collision he "dashed [*1326] out the port wing" and observed the wake of the *Hui Kuo No. 16* "to find out whether it was making any response to the ship's horns blowing." Nivera "frantically noted no indication of any response [ ] and shifted [his] attention to the fishing boat's wheel house." He stated,

> The lights [of the *Hui Kuo No. 16*'s wheelhouse] were on but no one in sight. -- My assumption was in [sic] was being run by auto pilot. In talking to a couple of fishing boat crew members after they came aboard, I was told the fishing boat capt. was asleep and supposedly had 2 other crew members at the wheelhouse. I was additionally told that minutes before actual collision one crew member left the wheelhouse to go take a shower. -- Shortly thereafter the collision.

Nivera's statement is supported by that of NY1 Edward Stallworth. Stallworth told the JAG investigators that when he heard the blasts from the *Ponchatoula*'s whistle, he ran out on deck and saw the *Hui Kuo No. 16* coming port on a course which would cut across the bow of the *Ponchatoula*. According to a summary of the JAG investigators' interview with Stallworth, he "could see one crewmember on the aft deck of the vessel approaching the *Ponchatoula*. A few seconds before the collision, YN1 Stallworth saw a second crewmember come up on deck." Stallworth could not see anyone on the starboard side of the bridge of the *Hui Kuo No. 16*.

The JAG Report also includes, *inter alia*, the following "opinions":

. . .

2. The collision could have been avoided had both vessels realized the danger of the situation with ample time to take positive action.

3. An earlier assessment of the danger of the situation may have occurred had the Watch Officer called the Master of the *Ponchatoula* in accordance with the Master's Standing Orders to inform him whenever vessels will have CPA's of less than 3 miles.

4. Once the danger of the situation was realized, Master, USNS *Ponchatoula*, took action in accordance with the International Rules of Navigation (e.g. slowing down, turning to starboard).

5. Under the circumstances (Head-On Situation, no obstruction to starboard) Master, F/V *Hui Kou* [sic] *No. 16*, contravened the International Rules of Navigation by turning to port to avoid the collision. . . .

[*1327] 7. The perceived course changes of the *Hui Kou* [sic] as seen from the *Ponchatoula* were probably the result of the natural left and right swing of a small vessel seen almost head on.

8. The Master of the *Hui Kou* [sic] *No. 16* was not on the bridge or had just arrived on the bridge at the time of the collision. . . .

10. The decision of the Master of the *Hui Kou* [sic] *No. 16* to turn to port 1 or 2 minutes after the *Ponchatoula* had turned hard to starboard was based on time late [sic] or erroneous information (*Ponchatoula* showing a green running light) and was the final cause of the collision.

The Court also admits into evidence defendant's Exhibits D, E and F. These documents, which are entitled "Notes of Evidence" were drafted by an English solicitor after he spoke, through interpreters, with Captain Shaw and deckhands Xu Xin Bin and Uttam Kumar Bapary of the *Hui Kuo No. 16*. n6 The documents were produced by plaintiff in response to the defendant's First Request for Production. n7

> n6 Defendant states that none of the crew members of the *Hui Kuo No. 16* were made available for deposition. Plaintiff concedes that it could not produce Captain Shaw or the two deckhands as witnesses due both to their having left the plaintiff's employ and the unavailability of compulsory process to compel their attendance at a deposition or at trial.
>
> n7 Plaintiff objects to the admission of these documents into evidence. However, the Court finds that the documents are admissible under Federal Rule of Evidence 801(d)(2).

Deckhands Bapary and Bin gave differing accounts of how Captain Shaw became alerted to the impending collision. According to the Notes, deckhand Bapary stated that he awoke Captain Shaw at approximately 6:05 a.m. in his cabin when he saw an oncoming ship with a green and a white light. n8 Bapary stated that when Captain Shaw came to the wheelhouse, he saw the oncoming vessel which at that time was "sounding 3 or 5 short blasts." This account indicates that Captain Shaw did not actually reach the bridge until the *Ponchatoula* was sounding her warning signals, when the collision was imminent. Deckhand Bin, on the other hand, stated that he met Captain Shaw on the starboard side of the after end of the poop deck at approximately 6:05 and informed him that there was a white light ahead. According to Bin, the Captain immediately returned to the bridge, and, approximately three to four [*1328] minutes before the collision, Captain Shaw started to maneuver the vessel to port. n9

> n8 Deckhand Xu Xin Bin only observed a white light on the *Ponchatoula*.
>
> n9 Captain Shaw's account of the events, contained in the Notes of Evidence, differs from his statements contained in the JAG Report, the Accident Report submitted to the Fisheries Representative of the Counsel of Agriculture of the Republic of China, and the Casualty Report submitted to the Kaohsiung Harbor Bureau. The Court finds it unnecessary to recite these differences, as it has adopted the findings of fact stipulated to by the parties, but reiterates that Captain Shaw has cast doubt on his own credibility by offering numerous differing and/or conflicting accounts.

The Notes of Evidence serve to illuminate further the confusion and chaos which reigned on board the *Hui Kuo No. 16* prior to the collision. Whether Captain Shaw was asleep or suffering from acute stomach pains as he stated in the Casualty Report, see *supra*, he was clearly not available to deal with the situation at hand until minutes before the collision. Moreover, the deckhands did not take any action to avert the collision, other than finding their Captain and alerting him of the danger, so that the *Hui Kuo No. 16* remained on auto pilot, travelling at a speed of 10 knots, until Captain Shaw finally arrived. Once he did arrive at the bridge, he was in a state of panic, and turned the *Hui Kuo No. 16* to port instead of starboard.

**Discussion**

*Jurisdiction*

Jurisdiction is premised on the Public Vessels Act (the "Act"). *See 46 U.S.C. app. §§ 781*-90. The Act provides that:

No suit may be brought under this chapter by a national of any foreign government unless it shall appear to the satisfaction of the court in which suit is brought that said government, under similar circumstances, allows nationals of the United States to sue in its courts.

*46 U.S.C. app. § 785.* Defendant contends that the reciprocity required by the Act is "questionable". Defendant has submitted a report by Xia Chen, who is currently an S.J.D. candidate at Tulane University School of Law. Plaintiff has submitted the affidavit of Hsi-Yen Jean, Esq., a practitioner of admiralty law licensed to practice in the Republic of China, and a copy of the official English translation of Chapter VI of the Maritime Law of the Republic of China. Having reviewed these submissions, the Court finds that plaintiff has met its burden of proving [*1329] that a United States national could prosecute an action against the Republic of China in that nation's courts for damages arising from a collision with a public vessel owned by Taiwan.

*Liability*

Plaintiff argues that the actions taken by the Captain and crew of the *Ponchatoula* violated four COLREG Rules, which were promulgated to prevent collisions, subjecting defendant to liability unless it can prove that these statutory violations could not have been causes of the collision. According to plaintiff, the *Ponchatoula* violated COLREG Rule 6 (Safe Speed), Rule 7 (Risk of Collision), Rule 8 (Action to Avoid Collision), and Rule 34 (Maneuvering and Warning Signals). In response, defendant denies that it violated COLREG Rules 6, 7, and 8 and asserts that its violation of COLREG Rule 34 could not have been a cause of the collision. Specifically, defendant states that the *Ponchatoula* was proceeding at a safe speed, made proper use of her radar equipment, made a timely determination of the risk of collision, took positive and timely action to avoid collision, and that the failure to sound a maneuvering signal was in no way causally related to the collision.

When "two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. . . ." *United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 411, 1975 AMC 541, 552 (1975).* It is well established that when a ship violates a statutory rule of navigation intended to prevent collisions, "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Steamship Pennsylvania v. Troop, 86 U.S. (19 Wall.) 125, 136 (1873); Potomac Transport, Inc. v. Ogden Marine, Inc., 1991 AMC 190, 195, 909 F.2d 42, 46 (2 Cir. 1990); Turecamo Maritime, Inc. v. Weeks Dredge No. 516, 872 F.Supp. 1215, 1229 (S.D.N.Y. 1994).* The so-called "*Pennsylvania* Rule" does not ipso facto impose liability; however, it shifts the burden of proof as to causation and imposes a presumption of fault on the party to whom it applies. *See Turecamo Maritime, Inc., 872 F.Supp. at 1229.*

[*1330] 1. *COLREG Rule 6 -- Safe Speed*

Rule 6 of the COLREGs provides:

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(i) The state of visibility;

(ii) The traffic density including concentrations of fishing vessels or any other vessels;

(iii) The manoeuvrability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

(iv) At night the presence of background light such as from shore lights or from back scatter of her own lights;

(v) The state of wind, sea and current, and the proximity of navigational hazards;

(vi) The draught in relation to the available depth of water.

(b) Additionally, by vessels with operational radar:

(i) The characteristics, efficiency and limitations of the radar equipment;

(ii) Any constraints imposed by the radar range scale in use;

(iii) The effect on radar detection of the sea state, weather and other sources of interference;

(iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

(v) The number, location and movement of vessels detected by radar;

(vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

*33 U.S.C. § 1602.*

[*1331] Plaintiff argues that, although visibility was good on the morning the collision took place, the density of the traffic situation ahead of the *Ponchatoula* and the amount of time required to slow or stop the vessel's forward motion indicate that the ship's speed of 18 knots was excessive. Plaintiff points to Captain Brent's testimony that there were numerous contacts in front of the *Ponchatoula* on its port and starboard sides, which were visible on the radar screen and with the naked eye. Plaintiff also finds it significant that Captain Brent had given night orders that he be advised three hours before the *Ponchatoula* reached a reference point known as One Fathom Bank, which, plaintiff states, is a narrow and heavily trafficked waterway situated between Malaysia and Indonesia. However, when Captain Brent arrived on the bridge, the *Ponchatoula* was approximately two hours and 15 minutes from One Fathom Bank. Finally, plaintiff notes that not until approximately 15 minutes after arriving on the bridge did Captain Brent order that the ship's speed be reduced from 115 RPM to 60 RPM, even though such a reduction in speed can take up to ten minutes.

The question of what is a proper rate of speed, so that a vessel can take appropriate and effective action to avoid collision, is relative to the situation that the vessel is in at any given moment. *Duet v. Delta Marine Drilling Co., 1964 AMC 497, 499, 215 F.Supp. 898, 900 (E.D.La. 1963).* Plaintiff has provided no testimony or case law in support of the proposition that, under the circumstances, the *Ponchatoula*'s speed was violative of COLREG Rule 6, and the Court finds that it was not.

When Captain Brent arrived on the bridge, the *Ponchatoula* had just turned left to 122 degrees to open up the CPA of the first tanker constrained by her draft, which passed on the ship's starboard side. At this time, the *Ponchatoula* was approximately 40 nautical miles away from One Fathom Bank and over 30 nautical miles away from either shoreline and background lights. Gioulis testified that there were light seas, good visibility, clear skies, and little wind. According to Captain Brent, there were no "strange occurrences that would operate on a vessel," such as a sudden drift of currents, in the area where the *Ponchatoula* was travelling. Moreover, the *Ponchatoula* was equipped with two operational radars, with a maximum effective range of 25 nautical miles, providing it with a more exact assessment of visibility.

Prior to Captain Brent's order to reduce speed, the *Ponchatoula* was proceeding at her normal transit speed of 18 knots, which was appropriate under the circumstances noted above. In accordance with COLREG Rule 8, the *Ponchatoula* had successfully altered her course [*1332] to avoid a "close-quarters situation" with the first tanker, which effected an uneventful starboard-to-starboard passing with the *Ponchatoula. See* COLREG Rule 8, *33 U.S.C. § 1602.* Subsequently, Captain Brent ordered the reduction in speed in order to allow more time to assess the situation and allow the second tanker to pass down the *Ponchatoula*'s starboard side. Captain Brent's order to reduce speed was timely and

appropriate. Nothing in the record demonstrates that COLREG Rule 6 required an earlier reduction in speed. Accordingly, the Court finds that defendant did not violate COLREG Rule 6.

*2. COLREG Rule 7 -- Risk of Collision*

Rule 7 of the COLREGS provides in pertinent part:

> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.
>
> (b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.
>
> (c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.
>
> . . .

*33 U.S.C. § 1602.*

"A vessel equipped with radar is under a duty to use it intelligently and fully, and the master or pilot who fails to do so is heavily burdened to prove that such fault did not contribute to the collision." *Complaint of Potomac Transport Inc., 1990 AMC 798, 814, 741 F.Supp. 395, 406 (S.D.N.Y. 1989)* (*quoting Arabian Am. Oil Co. v. Hellenic Lines, Ltd., 633 F.Supp. 659, 668 (S.D.N.Y. 1986)*). In *Potomac Transport Inc.*, the court found that "frequent radar observations would have immediately revealed *Potomac*'s bearing changes as well as her course and speed alterations," and the defendant's failure to use either of its two operational radars was, therefore, a contributing factor to the collision.

At the time of the collision, the *Ponchatoula* was equipped with two operational radars and a Raytheon Collision Avoidance System ("RAYCAS"), which had the capability of displaying the CPA, course and speed of designated contacts. At his deposition, Gioulis testified [*1333] that he did not use the RAYCAS on the day of the collision because the crew had been having trouble with it "as far as picture quality" n10 was concerned. Rather, Gioulis relied on the three centimeter radar and visual observations. Once he located the radar contacts visually, Gioulis performed a relative motion plot of the contacts by marking their positions on the radar screen with a wax pencil every three minutes for a period of six minutes. After the first tanker turned left to pass the *Ponchatoula* on her starboard side, Gioulis performed a visual plot which he later confirmed by radar plot. Captain Brent, on the other hand, used the RAYCAS shortly after he arrived on the bridge to determine the CPA of the first tanker as she began passing the *Ponchatoula* on her starboard side. The Captain used the RAYCAS again a few minutes later to designate the *Hui Kuo No. 16* at a range of two and a half miles. After that, the *Hui Kuo No. 16* disappeared from the RAYCAS presentation "probably because he was too small, too low to the water and too close by now." Captain Brent stated that at that point he "went back to the radar" to hold the *Hui Kuo No. 16.*

> n10 Gioulis also stated that when the RAYCAS "acquires a target, it puts a round circle around that target. In this case it put an oval circle, which would indicate some type of problem." *Id.*

Plaintiff argues that neither Captain Brent nor Gioulis effectively used the radar systems available to them on the morning of March 23, failing to make a determination of the *Hui Kuo No. 16*'s course or speed from the time she was first observed until the time of the collision. Further, plaintiff submits that Gioulis' concern about the RAYCAS' disfunctioning is not supported by the evidence, and, had Gioulis used the RAYCAS system, he and Captain Brent would have obtained an early realization of the danger of the situation with ample time to take positive collision avoidance action.

The Court finds that, while Gioulis did not use the RAYCAS system, he did plot the three contacts on the radar screen with a wax pencil and subsequently performed a visual plot of the first tanker, which he confirmed by radar plot, thereby satisfying COLREG Rule 7's requirement to perform "radar plotting or equivalent systematic observation of detected objects." *33 U.S.C. § 1602.* Captain Brent, moreover, used the RAYCAS to designate the first tanker and, after

the second tanker turned left to pass on the *Ponchatoula*'s starboard side, he designated the *Hui Kuo No. 16* with the RAYCAS, as well. In addition, while the first tanker was passing the *Ponchatoula*, Captain Brent used the ship's [*1334] telescope alidade to take visual bearings of the second tanker and the *Hui Kuo No. 16*. In sum, the Court finds that the *Ponchatoula* made proper use of her radar equipment and did not violate COLREG Rule 7.

### 3. COLREG Rule 8 -- Action to Avoid Collision

Rule 8 of the COLREGS requires that actions taken to avoid collisions shall be substantial, be made early enough so as to be unmistakably apparent to the other vessel and be such as to result in passing at a safe distance. Rule 8 provides, in relevant part,

> (a) Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.
>
> (b) Any alteration of course and/or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course and/or speed should be avoided.
>
> (c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.
>
> (d) Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.
>
> (e) If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

*33 U.S.C. § 1602.*

Plaintiff states, and defendant agrees, that the *Ponchatoula* and the *Hui Kuo No. 16* were in a "head-on situation" as defined by COLREG Rule 14. Rule 14 provides as follows:

> (a) When two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other.
>
> [*1335] (b) Such a situation shall be deemed to exist when a vessel sees the other ahead or nearly ahead and by night she could see the masthead lights of the other in a line or nearly in a line and/or both sidelights and by day she observes the corresponding aspect of the other vessel.
>
> (c) When a vessel is in any doubt as to whether such a situation exists she shall assume that it does exist and act accordingly.

*33 U.S.C. § 1602.*

Plaintiff concedes that, under normal circumstances, the *Ponchatoula* was required by the COLREGS to alter her course to starboard, as she did, to pass the *Hui Kuo No. 16* on her port side. For example, in *Complaint of G & G Shipping Co., Ltd. of Anguilla, 1994 AMC 170, 767 F.Supp. 398* (D.Puerto *Rico 1991)*, the Court found that a vessel's sudden turn to port, directly into the path of an oncoming vessel, was the cause in fact, as well as the proximate or legal cause, of the collision. *1994 AMC at 182, 767 F.Supp. at 407.* The Court stated,

> Rule 14(a) of the 72 Colregs states that when a risk of collision exists due to vessels approaching on reciprocal or near reciprocal courses, each shall alter her course to starboard so that each shall pass on the port side of the other. This elemental rule is known to all seamen, seasoned and amateurs alike. Riley's failure to observe it, due to fear and panic, is unfortunate but inexcusable. Evidence conclusively shows that had Riley simply maintained his course, the collision would have been averted.

*Id.* (internal quotations omitted).

Plaintiff argues, however, that this was not a case of normal circumstances, since the *Ponchatoula* could not turn starboard until the second tanker had passed. The presence of a third vessel, plaintiff submits, was a "special circumstance", pursuant to COLREG Rule 2, n11 which [*1336] required the *Ponchatoula* to turn port. Defendant responds that only if the *Hui Kuo No. 16* had shown a green side light, indicating a turn to port, would the "special circumstances" have existed which would permit a departure from the requirements of Rule 14 under Rule 2.

> n11 Rule 2 provides that
>
> (a) Nothing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
>
> (b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger. *33 U.S.C. foll. § 1602.*

When the *Hui Kuo No. 16*'s green light disappeared, Captain Brent assumed that the vessel was turning right and that the *Ponchatoula* could not turn left. The Court finds that even if Captain Brent's assumption was incorrect, and the *Hui Kuo No. 16* was merely bobbing back and forth, his actions were reasonable under the circumstances and do not evince any neglect on his part. The "special circumstances" noted by plaintiff include not only the presence of a third vessel, but also the fact that, from the bridge of the *Ponchatoula*, it appeared that the *Hui Kuo No. 16* was turning right, as she would be expected to do pursuant to Rule 8. The *Ponchatoula* altered her course to starboard in accordance with Rule 8, while the *Hui Kuo No. 16* did not. In addition, the *Ponchatoula* reduced her speed, went to all stop and finally emergency back full, in accordance with Rule 8(e). In contrast, the *Hui Kuo No. 16* turned to port and increased her speed. The Court finds that the actions of the *Ponchatoula* were substantial, readily apparent and should have resulted in the two vessels passing at a safe distance; in short, the actions of the *Ponchatoula* did not violate COLREG Rule 8.

### 4. COLREG Rule 34 -- Maneuvering and Warning Signals

Rule 34 of the COLREGs requires power driven vessels in sight of one another to sound whistle signals to indicate certain maneuvers. In pertinent part, the Rule provides:

> (a) When vessels are in sight of one another, a power-driven vessel underway, when manoeuvering as authorized or required by these Rules, shall indicate that manoeuvre by the following signals on her whistle:
>
> One short blast to mean "I am altering my course to starboard";
>
> Two short blasts to mean "I am altering my course to port";
>
> Three short blasts to mean "I am operating astern propulsion".

. . .

(d) When vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in [*1337] doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. Such signal may be supplemented by a light signal of at least five short and rapid flashes.

. . . .

*33 U.S.C. § 1602.*

At approximately 5:22 a.m. Captain Brent ordered *Ponchatoula*'s rudder put over hard right, and one minute later the Captain gave the engine command of emergency back full. Both maneuvers were effected without sounding the required whistle signals pursuant to Rule 34. At approximately 5:25 a.m., Captain Brent did sound the "in doubt" signal of six short whistle blasts, and he sounded the same signal one minute later. Plaintiff contends that Captain Brent's failure to sound the maneuvering signals for the *Ponchatoula*'s hard right turn and astern propulsion were a direct cause of the collision, particularly in light of the "uncertainty onboard the *Hui Kuo No. 16* regarding the *Ponchatoula*'s movements during the last few minutes leading up to the collision." Defendant argues that the failure to sound the whistle signals could not have been a cause of the collision because (1) the bridge of the *Hui Kuo No. 16* was likely unmanned at the time when Captain Brent should have sounded the signals, as both deckhands had gone aft to find Captain Shaw, and (2) even if the deckhands were on the bridge and would have understood the signals, it is a fair inference that the deckhands still would have gone aft to find the Captain, since apparently neither deckhand had authority to maneuver the vessel on his own initiative.

Where sounding a whistle signal would have served no useful purpose, the failure to sound the signal is not faulty. *See United Overseas Export Lines v. Medluck Compania Naviera, S.A.*, 785 F.2d 1320, 1325 (5 Cir. 1986); *In re O.L. Schmidt Barge Lines, Inc.*, 475 F.2d 428, 431-32 (7 Cir.), cert. denied, 414 U.S. 828 (1973); *Maritrans Operating Partners L.P. v. M/T Faith I*, 1993 AMC 385, 400, 800 F.Supp. 133, 143 (D.N.J. 1992). In *United Overseas Export Lines*, the court noted that the captain of the plaintiff's vessel did not testify that the lack of a whistle signal had confused or misled him in any way, even though the captain of the defendant's vessel had ordered her engines astern without sounding the appropriate signal. *Id.* In that case, the Fifth Circuit affirmed the district court's holding that the plaintiff's vessel was at [*1338] fault for the collision because she was unaware of the defendant's vessel, a fact which could not have been remedied by the latter's signalling.

The Court finds that the failure of the *Ponchatoula* to signal her starboard turn and astern propulsion was not, and could not have been, a cause of the collision. The collision between the *Ponchatoula* and the *Hui Kuo No. 16* took place due to the negligence and mistakes of the Captain and crew of the *Hui Kuo No. 16*, not the *Ponchatoula*'s failure to signal her maneuvers. Nothing in the record indicates that the *Ponchatoula*'s failure to signal her maneuvers confused or misled Captain Shaw. Rather, Captain Shaw was confused because he had been absent from the bridge, and his deckhands failed to take action or alert the Captain in a timely manner. The *Hui Kuo No. 16* remained on auto pilot on a collision course with the *Ponchatoula*, while the *Ponchatoula* maneuvered to allow the passing of two tankers constrained by their drafts. Whether the *Hui Kuo No. 16* was bobbing in the water or turning starboard to show a red (port) running light, Captain Brent's actions in turning starboard and reversing the engines were reasonable and comported fully with the COLREG rules. If the *Hui Kuo No. 16* had turned starboard as well, as required by COLREG Rule 14(a), the collision would not have occurred. Accordingly, the Court finds in favor of defendant.

### 5. *Defendant's Counterclaim*

Defendant suffered no damages in the collision but has counter-claimed for its costs in defending against plaintiff's claim. The "general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith." *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 1988 AMC 223, 248, 829 F.2d 293, 309 (2 Cir. 1987), cert. denied, 484 U.S. 1042, 1988 AMC 2399 (1988). Even though the Court holds that defendant's actions did not cause the collision, it does not find that plaintiff brought this action in bad faith. Accordingly, defendant's request for costs is denied.

**Conclusion**

1996 AMC 1313, *

Page 16

For the reasons set forth above, the Complaint is dismissed on the merits. Defendant's request for costs is denied. The Clerk of the Court is directed to enter judgment for defendant and close the case.