UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Wu Tien Li-Shou, | : | |
| Plaintiff, | : | |
| v. | : | Civil No. 1:13-cv-01366-JFM |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | |

...oOo...

**UNITED STATES' REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant United States of America replies to Plaintiff's opposition to the motion to dismiss the Complaint. Plaintiff's arguments do not convert this case into a justiciable controversy. To the contrary, the overwhelming body of recent case law establishes that this action should be dismissed in consideration of the separation of powers principles set forth in *Baker v. Carr*.

**(1) Plaintiff's Allegations Implicate the *Baker v. Carr* Factors.**

The facts here implicate the first, and most important, factor set forth in *Baker v. Carr*: impingement on the constitutional commitment of military action and foreign relations to the Executive and Legislative Branches. *Baker v. Carr*, 369 U.S. 186, 217 (1962). In addition, the Court lacks manageable standards to judge the circumstances of the NATO counter-piracy mission and its execution, including the allegations concerning

ammunition selection, lines of authority in the alliance operation, acceptable levels of operational risk, and the disposition of the damaged pirate ship.  The strategic and tactical decisions involved in conducting a multinational military counter-piracy engagement at sea inherently implicate political questions.  *See El Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 845 (D.C. Cir. 2010) (declining to fashion out of whole cloth "some standard for when military action is justified").  "The decision to take military action is a 'policy determination of a kind clearly for nonjudicial discretion.'"  *Id*. at 845.  Plaintiff's argument that the military action was "reckless" (ECF No. 7 at 3) asks the Court to judge whether USS GROVES's Commanding Officer properly complied with military orders and the applicable NATO Rules of Engagement, questions that the Constitution commits to the Executive and Legislative Branches.  This case also features foreign policy questions because the Navy action was undertaken in support of NATO Operation Ocean Shield and at the direction of a foreign military commander.  The cases that are most on point, both factually and legally, overwhelmingly support dismissing this action.[1]

---

[1] *See Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402 (4th Cir. 2011) (affirming dismissal of tort lawsuit challenging contractor's electrical repairs in Iraq because the allegations would have required assessment of military decisions); *El Shifa*, *supra* (affirming dismissal of tort lawsuit challenging the erroneous bombing of a pharmaceutical plant in Sudan); *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) (ruling that wrongful death action brought under the Public Vessels Act was nonjusticiable because it would require the court to interject itself into military decision-making and foreign policy); *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) (dismissing tort lawsuit as nonjusticiable when civilian airplane collided with U.S. military airplane conducting NORAD mission).

**(2) This Case Is Barred by Separation of Powers Principles.**

The political question doctrine stems from the doctrine of separation of powers. "The political question doctrine had its genesis in the Supreme Court's decision of *Marbury v. Madison*, where Chief Justice Marshall explained that '[q]uestions, in their nature political, of which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" *Taylor*, 658 F.3d at 408.

The Fourth Circuit addressed the principle of separation of powers in detail in *McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc). In ruling that the discretionary function exception applied to cases brought under the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, the court ruled that the exception to tort liability was necessary to maintain the Executive Branch's ability to "faithfully execute" the law as required by the Constitution. *McMellon*, 387 F.3d at 342. The court reached this decision even after specific consideration of many of the older cases cited in Plaintiff's brief at pages 10-12 and 15-16. *McMellon*, 387 F.3d at 346-47 (discussing *Canadian Aviator*, *Australia Star*, and *Pacific-Atlantic S.S. Co.*). Although some older cases apparently permitted an action to proceed against the United States for conduct that might now be deemed to fall under the political question doctrine or the discretionary function exception, the Fourth Circuit declined to give too much effect "to the ambiguity of pre-1960 case law." *Id*. at 347. The court noted that certain defenses might not have been raised by the government in those cases, or that something about those particular claims warranted treatment different from what we would see today. *Id*. The court concluded: "we do not believe that we can subordinate compelling separation-of-powers concerns to

3

the ambiguous silence of the early SIAA and PVA cases." *Id.*  Like the discretionary function exception analysis, the political question doctrine has been clarified in the years since *Baker v. Carr*, and recent case law establishes that the doctrine bars Plaintiff's action.

### (3) Plaintiff's Tort Allegations Do not Make this Case Justiciable.

As *Tiffany*, *Aktepe*, *Taylor*, and *El-Shifa* establish, a complainant cannot avoid the political question doctrine by styling the complaint as a tort action.  Plaintiff alleges that U.S. Navy and NATO commanders acted tortiously, but these allegations cannot render justiciable an otherwise non-justiciable political question.  Laying a stratum of tort law upon U.S. Navy and NATO commanders would have an impermissibly confining effect on military operations.  *See Tiffany*, 931 F.2d at 279.

Plaintiff's assertions of negligence on the part of the Commanding Officer of USS GROVES highlight the nonjusticiability of the allegations.  Plaintiff argues that USS GROVES fired weapons from a distance that was too remote, that it used one kind of ordnance when it should have used another, and that the Navy should have provided louder verbal warnings or warnings in Mandarin.  (ECF No. 7 at 3, 6.)  Plaintiff questions the range of the weapons on the pirate ship and the disposition of the vessel after the engagement.  (ECF No. 7 at 4.)  Assessment of these alleged facts cannot be separated from an analysis of nonjusticiable military decision-making.  (ECF No. 3-1 at 20.)

In holding that the political question doctrine barred a tort action arising from the allegedly mistaken bombing of a pharmaceutical plant in Sudan, the D.C. Circuit held that the doctrine "bars our review of claims that, regardless of how they are styled, call

into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion." *El Shifa*, 607 F.3d at 842. The court declined to judge the "veracity of military intelligence" or second-guess the military's strategic decisions. *Id*. at 844-46. Thus, even when military action was alleged to be mistaken and not justified, the political question doctrine barred any tort action. Similarly, in *Aktepe*, where a series of miscommunications led to the Navy's firing upon NATO allies in a training mission, the wrongful death tort action was dismissed because it implicated foreign policy and military discretion. "The interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Aktepe*, 105 F.3d at 1404. National security concerns were also at issue in *Tiffany*, where the Fourth Circuit held, "Tiffany cannot reshape the national response to threats of hostile air attack through the mechanism of tort law." *Tiffany*, 931 F.2d at 278.

In the present case, the President declared that the persistent acts of piracy off the coast of Somalia posed "an unusual and extraordinary threat to the national security and foreign policy of the United States." Message from the President to the Senate, 157 Cong. Rec. S2264-01, 2011 WL 1327560 (Apr. 7, 2011). Members of Congress likewise declared the piracy situation off the coast of Somalia to be an issue of national security. (ECF No. 3-1 at 6.) The response by the United States and its allies to this security threat cannot be the subject of a tort action.[2]

---

[2] Given that the political question doctrine bars this action, discovery is not appropriate in this case. The allegations of the Complaint are more than sufficient to

**(4) Plaintiff Cannot Make this Case Justiciable by Challenging the Status of the Actors.**

Plaintiff argues that the allegations are against the actions of "a U.S. Navy commander," claiming the commander "disregarded his instructions." (ECF No. 7 at 17-19.) The court in *Aktepe* rejected a similar argument: "Appellants' effort to cast their suit as a common negligence action directed at lower-level military operatives is unconvincing." *Aktepe*, 105 F.3d at 1404. The Eleventh Circuit ruled that the allegations in that case "launch[ed] a far more sweeping assault on the Navy's practices" than the plaintiffs admitted, because the complaint implicated the Navy's "communication, training, and drill procedures." *Id*. Moreover, "even if the complaint actually targeted only operational level personnel, that fact would not eliminate the justiciability problem" because the court would still need to evaluate how Navy personnel should have behaved. *Id*. "Such judicial intrusion into military practices would impair the discipline that the courts have recognized as indispensable to military effectiveness." *Id*.

As in *Aktepe*, the allegations here extend far beyond the alleged negligence of a single officer. Plaintiff admits that this was a NATO operation. (ECF No. 7 at 5.) Plaintiff's allegations therefore challenge the propriety of a mission commanded by an international alliance in support of the North Atlantic Treaty. Plaintiff disputes whether

---

resolve the motion in the United States' favor. Indeed, the discovery requested (ECF No. 7 at 4) "would result in precisely the kind of unnecessary intrusion and entanglement with the military that the political question doctrine was designed to avoid." *In re KBR, Inc., Burn Pit Litig.*, No. 09-md-2083, 2013 WL 709826 (D. Md., Feb. 27, 2013) (denying discovery in case dismissed under political question doctrine). This is especially true because Operation Ocean Shield remains ongoing and any discovery would be greatly complicated, if not futile, due to the classified nature of the U.S. Navy and NATO documents.

the U.S. Navy complied with the applicable NATO Rules of Engagement. (ECF No. 7 at 3.) Plaintiff's allegations would require examination of nonjusticiable issues such as the U.S. Navy's training and communications, the military weapons and ammunition, the safety of those aboard USS GROVES, and the procedures established to support the NATO mission, including matters of military intelligence, multinational command and control, the NATO Rules of Engagement, and foreign alliances.

The United States does not argue that all actions by military officers should be immune from suit; rather, the Court needs to analyze *the nature of the challenged acts* in considering the *Baker* hallmarks. For example, even though the alleged negligent actor in *Taylor* was an employee of a contractor, the court found the action nonjusticiable because considering the merits of the claim would require a court to judge decisions made by the U.S. Marines in providing electricity in a combat zone. *Taylor*, 658 F.3d at 411-12.

Plaintiff further argues that the President of the United States may have had no involvement with the alleged incident. (ECF No. 7 at 23.) The political question doctrine does not require personal involvement of the President of the United States. *Tiffany*, 931 F.2d at 278 ("[T]he same considerations which preclude judicial examination of the decision to act must necessarily bar examination of the manner in which that decision was executed by the President's subordinates.").

Plaintiff challenges strategic and tactical decisions made during armed conflict in support of an international alliance. These allegations fall squarely within the *Baker v. Carr* factors, including the constitutional commitment of the issue to the Executive and

Legislative Branches, the lack of judicially manageable standards, and the respect due coordinate branches of the government, in particular the focus of the Executive and Legislative Branches on using military power to combat piracy.

**(5) Prize Cases Do not Support Justiciability.**

Plaintiff relies on dicta from *The Paquete Habana*, which concerned the condemnation of a prize of war. (ECF No. 7 at 9, 14, 17-18.) Prize cases are far different from tort cases and have a unique and lengthy history in international admiralty law. In a prize case, historically, a libel in rem would be brought before a prize court for condemnation of the vessel and cargo that were captured during war and, if successful at trial, would result in the proceeds being divided among claimants, who might include the officers and crew of the capturing vessel (often privateers), creditors, and the capturing sovereign.[3] The long history of prize law dates back for centuries and was developed through the law of nations and through sovereign states' municipal powers. Establishing the jurisdiction of prize courts was critical to engaging the services of privateers during war. *Id.*

In the United States, federal statutes established that district courts would sit as prize courts. The modern version of the prize statute is 10 U.S.C. § 7652: "The United

---

[3] *See generally* Donald A. Petrie, *The Prize Game: Lawful Looting on the High Seas in the Days of Fighting Sail* (1999). Statutes dating back to 1780 established formulas for distribution of prize money among U.S. Navy crew and officers. Disputes over claim distribution could end up in the Court of Claims. *See, e.g.*, *Sampson v. United States*, 35 Ct. Cl. 578 (Ct. Cl. 1900). Congress stopped the practice of prize distribution in 1899, 30 Stat. 1007 (1899), and any prize money recovered today would be paid into the U.S. Treasury. 10 U.S.C. § 7668.

States district courts have original jurisdiction, exclusive of the courts of the States, of each prize and each proceeding for the condemnation of property taken as prize . . . ." *See also* U.S. Const. art I, § 8, cl. 11; 28 U.S.C. § 1333. Although the statute remains in effect, federal courts have not heard a prize case since 1948: *The Europa*, 80 F. Supp. 12 (S.D.N.Y. 1948) (condemning a German ocean liner).

*The Paquete Habana* involved two Spanish fishing vessels captured by the U.S. Navy near Cuba during the Spanish-American War. *The Paquete Habana*, 175 U.S. 677, 682 (1900). Although coastal fishing vessels were traditionally exempt from hostile capture under prize law, the United States brought a libel action and the fishing vessels were condemned and sold. *Id*. at 714. Following a lengthy discussion of the history of fishing vessels under international prize law, the Supreme Court reversed the condemnation and ordered that the proceeds of the sale be returned to the vessels' owners because coastal fishing vessels were exempt from capture. The telegraph communication between the Admiral and the Secretary of the Navy, discussed in Plaintiff's opposition at page 14, was apparently submitted to the Court to show the Navy's knowledge of the laws concerning coastal fishing vessels and fisherman. *Id*. at 713. Because Congress explicitly placed prize cases in the district courts, and the Executive Branch consented to such jurisdiction by affirmatively submitting the two captured vessels to the district court for condemnation, the prize case was subject to judicial proceedings and review. *Paquete Habana*, 175 U.S. at 679.

*The Paquete Habana* does not support Plaintiff's argument that the present action is justiciable. The present case is not a libel in rem, but a purported tort action against the

sovereign state.  Congress has not passed any counter-piracy statute similar to the statute establishing jurisdiction for prize cases, nor has the Executive submitted the matter to the jurisdiction of the district court for review.  The separation of powers principles at issue here are not at issue in prize cases.  Prize law, including *Paquete Habana*, *L'Invincible*, and the other prize cases cited by Plaintiff, has no role in this case.

    **(6)  Any Degree of Harm to the Counter-Piracy Mission by this Lawsuit Is Irrelevant to the Political Question Doctrine.**

Plaintiff argues that "[n]othing in the Complaint resists the effort to combat pirates . . . ."  (ECF No. 7 at 23.)  The Court need not determine whether Plaintiff's Complaint would actually harm the United States' mission to combat piracy.  Rather, the Court must determine whether any one of the *Baker v. Carr* characteristics is present here, including whether the present controversy has been committed to the Executive and Legislative Branches.  Given that military counter-piracy operations and foreign relations have been committed to the coordinate branches, this case is not justiciable.

    **(7)  No Factual Determinations Are Necessary to Dismiss this Action.**

Although factual determinations are not necessary to resolve this motion, the United States notes that Plaintiff apparently misinterpreted the time zones indicated in the U.S. Navy's releasable unclassified investigation report, leading to an incorrect assertion that the USS GROVES's engagement with the pirates began "at 2:16 in the morning, local time."  (ECF No. 7 at 3.)  According to the Navy's investigation, the relevant events occurred on the "morning of 10 May 2011," with a series of verbal warnings for the pirates to capitulate, followed by warning shots, followed by more verbal warnings,

between 0216Z and 0252Z. (ECF No. 3-6 at 3.) The letter "Z" in these times represents "Zulu" or GMT time.[4] The local time was +4 hours ahead of Zulu time. (ECF No. 3-6 at 1.) USS GROVES began hailing the pirates at 6:16 a.m., not 2:16 a.m.

The Court may also wish to take notice of the range of the weapons at issue, although, again, no factual determinations are necessary here. Although Plaintiff questions the range of the pirates' weapons, NATO forces believed the pirates were carrying small arms and rocket-propelled grenades. (ECF No. 7 at 2.) After the engagement, the Navy found on the pirate ship multiple grenade launchers and rounds, eighteen AK-47 rifles, and two "heavier machine guns." (ECF No. 3-6 at 5.) The widely distributed RPG-7 rocket-propelled grenade launcher has a sighting range of 500 meters and a maximum range of 900 meters; the AK-47 has a sighting range of up to 1,000 meters.[5] In challenging the reasonableness of USS GROVES's safe stand-off zone, Plaintiff implicates the military's tactical decision-making and use of intelligence about the capability of the pirates' weapons. Regardless of the actual range of the weapons, this issue is not justiciable because it implicates military combat tactics, intelligence, and weapons analysis that are not appropriate subjects for a civil tort action.

---

[4] *See* "What is Zulu Time," *available at* www.navy.mil/navydata/questions/zulutime.html.

[5] *See* United States Army Training and Doctrine Command Bulletin, *Soviet RPG-7 Antitank Grenade Launcher* at 5 (Nov. 1976), *available at* www.fas.org/man/dod-101/sys/land/row/rpg-7.pdf; Izhmash, *AKM (AK-47) Kalashnikov modernized assault rifle, caliber 7.62mm*, *available at* www.izhmash.ru/files/pdf/akm_eng.pdf.

Plaintiff also asserts that USS GROVES was "operating in a ministerial environment" with respect to the pirate ship following the U.S. Navy's removal of the pirates, and that the pirate ship retained Taiwanese identity. (ECF No. 7 at 21.) While it is unclear what Plaintiff means by "ministerial environment," to the extent Plaintiff argues that the U.S. Navy owed any duties to Taiwan's Ministry of Foreign Affairs, or that the United States violated some international obligation to Taiwan as flag-state of JCT 68, the matter cannot be heard in this tort action. Taiwan is not the Plaintiff and, further, any complaints by Taiwan would likely be addressed through diplomatic channels.

    **(8) Civilian Analogies Do Not Apply Here.**

Plaintiff seeks to analogize the Navy's use of military force to situations involving civilian police powers or civilian search and rescue operations, including activities of the U.S. Coast Guard or private mariners engaged in Good Samaritan rescue activities. No such analogies are appropriate for the political question doctrine analysis. This case must be addressed for what it is – a challenge to the methods used by the President's commissioned naval officers in the execution of the President's constitutional authority to use the Navy to combat piracy, as well as the authority of the President and Congress to conduct diplomatic relations and support our alliance obligations.

If Plaintiff means to contend that USS GROVES's use of force is akin to the routine use of force by a domestic police force and so likewise can be subject to tort analysis, then Plaintiff misapprehends the business of the U.S. Navy and its constitutional authority. As a warship assigned to support NATO CTF-508, USS GROVES undertook

the use of military force to secure the United States' interests abroad by maintaining commercial sea lanes for global commerce. (ECF No. 3-1 at 1-7.) Such action is not akin to a Coast Guard vessel involved in domestic law enforcement.

Similarly inapt is Plaintiff's attempt to use the narrow body of tort law involving "Good Samaritan" maritime rescuers to provide manageable judicial standards. None of the eight maritime rescue cases cited by Plaintiff involves combatant activity. Rather, those cases arose from non-belligerent civilian rescue efforts. *See, e.g.*, *Sagan v. United States*, 342 F.3d 493, 498 (6th Cir. 2003) (adopting Restatement definition that maritime rescuer liability applies only to one who undertakes to render services to another). NATO CTF-508's mission is to "conduct counter piracy operations in the Gulf of Aden and Somali Basin in support of NATO Operation OCEAN SHIELD." (ECF No. 3-6 at 1.) NATO CTF-508 assigned USS GROVES "to shadow and then disrupt the pirate mothership JCT 68." (ECF No. 3-6 at 2.) Because USS GROVES's principal mission was to disrupt a pirate ship, and because the resultant hostage rescue occurred in combat, importing civilian maritime rescue tort law to gain judicially manageable standards for reviewing this case would be wholly improper. *See Aktepe*, 105 F.3d at 1404 (ruling that courts lack standards to assess "reasonable care" in military operations).

NATO Operation Ocean Shield is not a domestic police operation or a search-and-rescue mission. It is an ongoing international alliance of navies combatting piracy, using force when necessary. Plaintiff's analogies to civilian activities are contrary to generally accepted concepts of international maritime security and naval warfare. Plaintiff fails to cite a single case that is factually on point in support of its position.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Complaint be dismissed. Fed. R. Civ. P. 12(b)(1).

Dated: September 12, 2013

>Respectfully submitted,
>
>STUART F. DELERY
>Assistant Attorney General
>
>ROD J. ROSENSTEIN
>United States Attorney
>
>JOSEPH BALDWIN
>Assistant United States Attorney
>
>By:   /s/ Jill Dahlmann Rosa
>JILL DAHLMANN ROSA
>THOMAS M. BROWN
>Trial Attorneys
>U.S. Department of Justice
>Civil Division, Torts Branch
>Aviation & Admiralty Litigation
>P.O. Box 14271
>Washington, DC 20044-1471
>Jill.Rosa@usdoj.gov
>Thomas.M.Brown@usdoj.gov
>(847) 732-1141 (Rosa)
>(202) 616-4033 (Brown)
>(202) 616-4002 (fax)

Of Counsel:

Lieutenant Mark deVry
Office of the Judge Advocate General
United States Navy
Washington, D.C.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of September, 2013, a copy of the foregoing was electronically filed in this case, which was served electronically on:

*Counsel for Plaintiff:*

Timothy B. Shea
Nemirow Hu & Shea
1900 L Street, N.W.; #303
Washington DC 20036
Tel: 202-835-0300
Fax:  888-522-4519
E-mail:  timbshea@aol.com

                                                /s/  Jill Dahlmann Rosa
                                               Jill Dahlmann Rosa
                                               United States Department of Justice